## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

**ITASCA IMAGES, LLC**,
a Minnesota limited liability company, and

**TONY WEBSTER**,
a Minnesota resident,

Plaintiffs,

v.

**SHUTTERSTOCK, INC.**,
a Delaware corporation,

**DOES 1–500**,

Defendants.

Case No. 21-cv-___287_____

**COMPLAINT**

JURY TRIAL DEMANDED

Plaintiffs allege against Defendants:

### INTRODUCTION

1.     This case's claims against Shutterstock, Inc. arise from repeated and ongoing copyright infringement and copyright management information violations involving 112 timely-registered photographs, which Shutterstock has illegally distributed and offered for sale to others. Despite Shutterstock receiving ten cease-and-desist demands over the course of 11 months, they've continued to infringe these photographs without explanation, leaving Plaintiffs no choice but to sue to enforce their rights.

2.     Shutterstock is a leading stock photography company trusted by millions of businesses and consumers who buy media for use in advertising and commerce, many

believing that when they pay to license and download such artwork, they are doing the right thing by supporting the artist while staying safe from claims of infringement. That's the promise Shutterstock makes with marketing terminology like "worry-free licensing" and "you're protected." In Shutterstock's Q3 2020 investor report, its executive chairman Jon Oringer claims: "we give our clients peace of mind by rigorously clearing content so it can be used by businesses for commercial use." This statement is false. In reality, many images Shutterstock offers for sale have been stolen from the true artist, and Shutterstock never had authority to make and distribute copies of the images or grant licenses to their customers—depriving photographers of their rights and income, degrading the integrity of their art, and exposing Shutterstock's customers to existential threats of infringement liability. Shutterstock does not adequately inform its customers of the legal, financial, and reputational risks that can arise from buying images from Shutterstock.

3.     That Shutterstock is a hotbed for stolen images is not news to Shutterstock. They maintain a forum where artists routinely complain about their work being wrongly sold by Shutterstock, and that when caught, Shutterstock does little to nothing to promptly cease infringement, while keeping the profits and claiming to be immune from suit. Photographers have made comments on Shutterstock's forum going back years, such as: "Shutterstock doesn't care," "This happens a lot," "SS is turning into a pirate site / black market free-for-all," "They [Shutterstock] don't have time for trivialities like that [stopping infringement]. They need all their capacity to count their money," "[It's] almost impossible to get [Shutterstock] to act or do anything about it," "I think [Shutterstock] just relies on nobody being big enough to take them to court.  Ultimately, unless that happens, [it's] of

2

no consequence to them at all—they make money either way," and "The ONLY thing that will make a difference here is if one of the copyright holders of the images that have been illegally uploaded to Shutterstock sues them."

4.      Plaintiff Itasca Images, LLC is the studio of photographer Tony Webster, an artist and photojournalist who created each of the 112 photographs in suit at great investment of time, cost, and creative energy—for example, some of the images required camping in subzero winter conditions in rural Minnesota, waking up before dawn, and hiking in the dark with a backpack full of camera gear. The photographs were protected with visible copyright notices and copyright management information embedded within the metadata, and some were intended to become limited edition fine art photographic prints. But Shutterstock copied these images and plastered their logo on top. For example:



5.      Shutterstock displayed Plaintiffs' 112 photographs on their website and offered to sell licenses to third-parties, along with downloadable copies of the work. Shutterstock distributed the photographs to partners like Facebook for use in social media

advertising and to a company in China selling the images for as little as 29 cents each. Shutterstock also programmed their website to falsely declare to search engines like Google that Shutterstock's website was the authoritative place to buy Plaintiffs' images.

6.      In March 2020, Plaintiffs sent four cease-and-desist letters to Shutterstock's headquarters, registered agent in Delaware, registered agent in Minnesota, and their "designated agent" on file with the U.S. Copyright Office. The images remained online. In September 2020, Plaintiffs sent Shutterstock another four cease-and-desist letters. Again, the images remained online, both by Shutterstock and some of their partners and affiliates. Shutterstock has ignored all of Plaintiffs' requests for information about who they have distributed the images to. In December 2020, Shutterstock started infringing another one of Plaintiffs' photographs. Plaintiffs immediately sent Shutterstock a cease-and-desist demand to its legal department and attorney, but now over a month later, that photograph still remains online and available for anyone to purchase on Shutterstock's website. As of the filing of this complaint, Shutterstock continues to infringe all 112 images.

## PARTIES

7.      Plaintiff Itasca Images, LLC (hereafter "Itasca") is a Minnesota limited liability company, with its principal place of business in Hennepin County, Minnesota.

8.      Plaintiff Tony Webster (hereafter "Webster") is an adult individual who resides in Hennepin County, Minnesota, and is the Managing Member of Itasca. Itasca and Mr. Webster are hereafter individually each a "Plaintiff" and collectively the "Plaintiffs."

9.      Defendant Shutterstock, Inc. ("Shutterstock") is a Delaware corporation, with its principal place of business in New York, New York.

10.     Defendants Does 1–500 are parties whose identities are currently unknown to Plaintiff, including those who Shutterstock unlawfully licensed or distributed the photographs in suit to, who displayed the photographs at Shutterstock's direction, who may have provided images to Shutterstock, or participated in the infringement scheme. Plaintiffs intend to amend this Complaint once such identities become known.

### JURISDICTION AND VENUE

11.     This action arises under the Copyright Act, 17 U.S.C. § 101, *et seq*.

12.     This Court has jurisdiction over this action pursuant to 27 U.S.C. § 1331 as a federal question, and original jurisdiction pursuant to 27 U.S.C. § 1338(a) as arising from an Act of Congress relating to copyrights.

13.     This Court has personal jurisdiction, and venue is proper here, because Shutterstock has consented to personal jurisdiction in this district by registering with the Minnesota Secretary of State as a foreign corporation and appointing a registered agent here. Shutterstock does substantial business in Minnesota through selling photography, copies of photography, photography licenses, and subscriptions to Minnesota consumers and businesses. Personal jurisdiction and venue as to all defendants is proper because: (1) the majority of the photographs in suit were created in Minnesota; (2) the infringement injured a Minnesota limited liability company and Minnesota resident; (3) Shutterstock and others who participated in the infringement scheme knew the creator of the photographs was a Minnesota resident; (4) Shutterstock offered to sell Plaintiffs' photographs into Minnesota; (5) Shutterstock served and offered the digital image files which represent copies of Plaintiffs' photographs from a server physically located in Minnesota; and (6)

Shutterstock has at least one employee who resides in and works from Minnesota. The Court has personal jurisdiction over any foreign Doe Defendants because they have sufficient minimum contacts with the United States, satisfying the due process requirements of the Fifth Amendment.

## FACTS

I.    **Shutterstock infringed a significant quantity of Plaintiffs' photographs, all of which were timely registered with the U.S. Copyright Office**

    (A)    **All of the Photographs were timely registered, entitling Plaintiffs to seek statutory damages at their election**

14.    This action involves 112 photographs, which are identified in the list attached hereto as **Exhibit A** and incorporated as if set forth fully herein; each individually hereafter a "Photograph" and collectively the "Photographs."

15.    Each of the Photographs was created by Tony Webster, a photographer and photojournalist who resides in Minneapolis, Minnesota. He is a member of the American Society of Media Photographers, National Press Photographers Association, Professional Photographers of America, and Society of Professional Journalists.

16.    Each of the Photographs was deposited with the U.S. Copyright Office and registration issued with an effective date within three months of first publication.

17.    The Photographs are registered across eight U.S. Copyright Office group registrations of published photographs ("GRPPH"), registration numbers: VA 2-229-733, VA 2-147-626, VA 2-147-455, VA 2-143-906, VA 2-142-502, VA 2-133-850, VA 2-133-848, and VA 2-129-807, which are referenced hereafter individually each as a

"Registration" and collectively as the "Registrations." Attached hereto as **Exhibit B** are true and correct copies of the certificates for each of the Registrations.

18.     The Registrations have been assigned to Plaintiff Itasca Images, LLC.

**(B)     The Photographs infringed by Shutterstock were highly creative and represent a substantial investment of time, money, and effort**

19.     The Photographs infringed by the Defendants required creative inputs depicting the artist's spirit and personality, investment of both time and money, technical skill, and physical, intellectual, and emotional labor, and were wholly original and copyrightable under the laws of the United States.

20.     Many of the Photographs infringed by the Defendants were created during a 10-week-long photography project in the winter of 2018–2019, wherein Mr. Webster camped in harsh winter conditions in rural Minnesota, frequently waking up before dawn to begin his work. By way of example, one of the Photographs Defendants infringed depicted a snow-covered island on Minnesota's North Shore of Lake Superior at sunrise. To capture this photograph, Mr. Webster researched weather and sky conditions in advance, woke up and left his campsite before dawn, drove to a particular location, and hiked in subzero weather conditions in the dark with a heavy backpack full of camera equipment to the ideal location. The camera equipment used to capture this and other Photographs were substantial financial investments. To smooth the appearance of the water and blur the clouds in the sky, Mr. Webster used a neutral-density filter, an expensive optical-quality dark glass placed over the lens which reduces the amount of light intake to allow a long-exposure photograph to be taken during daylight. This glass is highly

susceptible to breakage and required delicate handling while balancing heavy equipment on icy rocks on that cold, windy morning. Shutterstock unlawfully offered to sell this and other Photographs for commercial use, tarnishing the work.

21.     Plaintiffs' Photographs are of good quality.

22.     Plaintiffs' Photographs are aesthetically pleasing.

23.     Plaintiffs' Photographs are valuable.

24.     Plaintiffs' Photographs are unique.

25.     Some of the Photographs were intended for exhibition purposes only, as limited-edition fine art photographic prints with 200 copies or fewer, signed and consecutively numbered by the artist.

26.     Limited-edition photographic prints have a higher value.

27.     The majority of the Photographs were captured in Minnesota.

**(C)     The Photographs were protected with copyright management information, including copyright notices visually next to the Photographs and embedded in the image metadata**

28.     Each of the Photographs were originally published online by Plaintiff(s) with a visible copyright notice immediately below the Photographs which stated the photographer's name "Tony Webster" and "© All rights reserved." Some of the Photographs also had an additional copyright notice visible below the Photographs, which stated "© 2018 Tony Webster."

29.     Each of the Photographs was captured with professional camera equipment configured to embed Mr. Webster's name and a copyright notice into the metadata of digital imagery files at the time of capture.

30.     After the Photographs were captured, they were painstakingly reviewed, edited, and prepared using specialized software and processes. As part of this, additional metadata was added to each of the Photographs, such as descriptions of what the Photographs depict and where the Photographs were taken; keywords; geographical coordinates; and copyright management information ("CMI") such as the photographer's name, city, state, email address, website link, publication date, credit line text, and copyright notices.

31.     All of the photographs were originally published with metadata stating the photographer resides in Minnesota.

32.     Exchangeable Image File Format ("EXIF") and International Press Telecommunications Council ("IPTC") are standard sets of metadata embedded within professional digital photography files.

33.     EXIF metadata can contain, *inter alia*, information regarding the camera and lens make and model, exposure information like aperture and shutter speed, data documenting the timestamp and location of a photograph's capture, artist's name, copyright notices, and CMI.

34.     By way of example, Mr. Webster captured a photograph of the Kettle River winding through St. Croix State Park in Minnesota (Ex. A, p. 2, the "Kettle River Photo"). Among other things, the EXIF metadata of the Kettle River Photo included:

| Artist | Tony Webster |
| Copyright | © 2018 Tony Webster |
| [Camera] Model | ILCE-7RM3 |

| | |
|---|---|
| Lens Model | FE 100-400mm F4.5-5.6 GM OSS |
| Date/Time Original | 2018:12:09 16:17:48 |
| GPSLatitude | 45 deg 56' 42.59" N |
| GPSLongitude | 92 deg 46' 37.11" W |

35.    The IPTC website states: "IPTC Photo Metadata sets the industry standard for administrative, descriptive, and copyright information about images" and "IPTC Photo Metadata standard is the most widely used standard because of its universal acceptance among photographers, distributors, news organizations, archivists, and developers."

36.    IPTC metadata can include, *inter alia*, information describing a photograph, such as a title, description, captions, or keywords, geographical information, the photographer's name and contact information, copyright notices, and CMI.

37.    By way of example, some IPTC metadata in the Kettle River Photo included:

| | |
|---|---|
| Description | The Kettle River winds through St. Croix State Park, as seen from the Maple Island Landing on a winter afternoon sunset. |
| Keywords | Kettle River, Maple Island, Maple Island Landing, Minnesota, Saint Croix State Park, St. Croix State Park, cold, ice, river, river landing, snow, state park, sunset, winter |
| State | Minnesota |
| Artist | Tony Webster |
| Copyright Notice | © 2018 Tony Webster |
| Usage Terms | Copyright (c) 2018 Tony Webster. All rights reserved. |
| Copyright Flag | True |
| Creator Region | Minnesota |

10

| Creator Work Email | tony@tonywebster.com |
|---|---|
| Creator Work Telephone | +1 202-930-9200 |

38.     All modern digital cameras write metadata into image files.

39.     All modern photography-editing software writes metadata into image files.

40.     Copyright notices in metadata are a standard measure used by copyright owners to identify and protect their copyrighted works.

41.     Metadata is a standard technology used by the stock photography industry.

42.     EXIF and IPTC metadata are contained within image files and are always transmitted along with the image, unless explicitly removed.

43.     Accurate metadata is important.

44.     Shutterstock has stated that "Metadata is important because it powers the search and discoverability of media content."

45.     It is important to preserve copyright management information.

46.     Some of the Photographs in suit, as infringed by Defendants, were modified from the original, such as being flipped on the vertical axis (*i.e.*, a mirror or reverse image), oversaturated in color, or with a red-pink tint applied. Plaintiffs did not apply these visual effects nor authorize any other person to apply these visual effects. As used in this complaint, the term "Photograph(s)" includes modified versions thereof.

## II.    Shutterstock has turned mass copyright infringement of artists' work into a revenue-generating business model

47.     Businesses and consumers seeking photography to use in advertising campaigns, mailers, promotional content, and newsletters turn to companies like

Shutterstock to purchase downloadable copies of such works, along with a license to copy, use, and display such works.

48.     Shutterstock promotes itself as being "a leading global provider of high-quality licensed images, videos, and music" and "a top source of high-quality content for multimedia producers world-wide."

49.     Shutterstock owns, operates, manages, controls, and benefits from the website located at https://www.shutterstock.com/ (the "Shutterstock Website" or "Shutterstock's Website").

50.     Shutterstock controls the domain name SHUTTERSTOCK.COM.

51.     Shutterstock has set up, owns, operates, manages, controls, and benefits from the subdomain IMAGE.SHUTTERSTOCK.COM.

52.     Shutterstock sells photographs.

53.     Shutterstock obtains a financial benefit from the images available for license on the Shutterstock Website.

54.     Shutterstock sells downloadable image files.

55.     Shutterstock sells copies of photographs.

56.     Shutterstock sells digital reproductions of photographs.

57.     Shutterstock sells licenses to photographs.

58.     Shutterstock sells subscriptions which allow their customers to download and obtain licenses to use photographs.

59.     Shutterstock distributes photographs for its financial benefit.

60.     Shutterstock distributes photograph licenses for financial gain.

61.     Shutterstock has described itself as a "media licensor."

62.     Shutterstock has described itself as a "licensing agency."

63.     Shutterstock has described itself as a "provider of digital imagery."

64.     Shutterstock has described the Shutterstock Website as a "freely searchable collection of content that our users can license, download and incorporate into their work."

65.     Shutterstock's Website states: "You don't need to be a subscriber to browse our selection of over 300 million images."

66.     Shutterstock's website allows anyone to perform a search for imagery, but they must pay to purchase copies or obtain licenses.

67.     Shutterstock's website allows their customers to perform a search for imagery, or browse categories or keywords of imagery, for which to purchase licenses to.

68.     Shutterstock describes itself as using data generated from searches and content downloads, behavioral data, keyword data, search algorithms, deep-learning powered search tools, and innovative artificial intelligence technologies.

69.     Shutterstock hires photographers to create some images Shutterstock sells.

70.     Shutterstock sources some of the photography they sell on the Shutterstock Website from who they call Shutterstock Contributors (hereafter "Contributor(s)").

71.     Shutterstock suggested that Plaintiffs' Photographs were uploaded and submitted by a Shutterstock Contributor.

72.     Shutterstock solicits Contributors to, as they describe it, "submit" photography to Shutterstock via an upload process on the Shutterstock Website.

73. Shutterstock's Website states that its Contributors "produce high-quality images and videos for our customers to download."

74. According to Shutterstock's Website, Contributors upload photography and submit it for Shutterstock's review.

75. After Shutterstock's Contributors upload imagery, Shutterstock reviews the imagery and decides whether the image(s) meet their standards.

76. Shutterstock has stated that its review process includes evaluating imagery for potential copyright infringement.

77. Shutterstock has stated that images submitted by Contributors are reviewed for metadata accuracy.

78. Shutterstock's review process can lead to images being rejected, in which case they are not displayed on the Shutterstock Website to the public and are not offered for sale or distribution.

79. Shutterstock's review process can lead to images being approved and accepted, in which case they are publicly displayed on the Shutterstock Website and offered for sale and distribution.

80. Shutterstock's Website states that "When images are submitted, reviewers are looking at many things including the quality of your content, such as focus, lighting, composition, sensor dust spots, and noise."

81. Shutterstock's website states that "the review process is subjective."

82. Shutterstock only accepts images that have commercial value.

83.     Shutterstock's website states a commonly questioned rejection reason is: "Limited Commercial Value. We do not need this image at this time."

84.     Shutterstock rejects Contributor uploads with public domain content.

85.     Shutterstock's website states that if an image has been rejected for having limited commercial value, simply cropping the image differently or altering the colors "will not get the image accepted and may lead to a warning." Instead, the Shutterstock website prompts: "Is there any way you can change it to make it marketable?"

86.     Shutterstock has the ability to control the images they display.

87.     Shutterstock has the ability to control the images they offer for sale.

88.     Shutterstock has the right to control the images they display.

89.     Shutterstock has the right to control the images they offer for sale.

90.     By way of example, Shutterstock maintains a list of events for which it will only accept photography from a Contributor if they can prove they received press credentials. Shutterstock also maintains a list of events for which they will not accept photographs from even if the photographer is credentialed, like the Golden Globe Awards.

91.     Once an image is approved by Shutterstock reviewers, it is available for searching, display, sale, license, and download by others on the Shutterstock Website.

92.     When a person purchases imagery from the Shutterstock website, Shutterstock grants them a license to use that photograph, and Shutterstock provides a downloadable copy of the photograph.

93.     Shutterstock's Website contains the following graphic which describes the Shutterstock Contributor image review process:



94.     Shutterstock offered Plaintiffs' Photographs under their "Standard Image License," which granted third parties a right to use the images as a digital reproduction including on websites, in online advertising, email marketing, apps, and YouTube videos; in physical form in product packaging and labeling, CD and DVD cover art, magazines, and newspapers; in out-of-home advertising campaigns like billboards and street furniture; in film, video, TV series, and advertisements; and personal use. Some of these categories had 'impression' or view count limits.

95.     Shutterstock indemnifies those they provide their "Standard Image License" to, up to a total maximum aggregate obligation and liability of $10,000.

96.   Shutterstock also offered Plaintiffs' Photographs under their "Enhanced License," which provided an increased $250,000 indemnification cap, and allowed images to be used in merchandise for promotional or retail use, in templates, or commercial space decoration; and removes impression or view count limits in the standard license.

97.   Shutterstock requires their customers who purchase images or licenses from the Shutterstock Website which Shutterstock never had the authority to sell pay their own legal defense costs and damages exceeding $10,000 in the event Shutterstock's customer is sued, under Shutterstock's Standard Image License terms.

98.   Shutterstock is aware that copyright infringement is a frequent occurrence on the Shutterstock Website.

99.   Shutterstock is aware that Contributors have uploaded stolen images.

100.   Shutterstock is aware that they have approved and accepted infringed images.

101.   Shutterstock has received copyright claims or notices on image(s) uploaded by a Contributor but kept that Contributor's other purported image(s) online.

102.   Shutterstock routinely ignores red flags that make infringement apparent.

103.   In Shutterstock's Q3 Investor Report, Shutterstock Founder and Executive Chairman Jon Oringer stated in a published video: "We give our clients peace of mind by rigorously clearing the content so it can be used by businesses for commercial use. And our worry-free licensing solution means our customers can focus on the creative projects that support their business."

104.   Shutterstock's Website states the company's reviewers are a "global network of professionals with significant experience in the creative sector," and that they are

"thoroughly trained on Shutterstock technical and metadata standards as well as compliance policies."

105.   Shutterstock's Website states that "each Shutterstock image is rigorously vetted by a professional review team for technical execution and compliance with copyright regulations."

106.   In a video embedded within Shutterstock's Q3 Investor Report, Shutterstock's VP of Content Operations Paul Brennan states: "we review the value and integrity of all content".

107.   Shutterstock's Website states all photographs are "evaluated for potential trademark or intellectual property violations, as well as possible copyright infringements."

108.   Shutterstock's Website states "Every single Shutterstock image is reviewed for quality, metadata accuracy, and compliance with copyright and intellectual property laws prior to being accepted into our library."

109.   Shutterstock reviews artwork submitted by purported Contributors for technical execution, such as lighting, focus, and noise; metadata accuracy, relevance, and compliance restrictions; and for aesthetic appeal and commercial value.

110.   When a copyright holder reports to Shutterstock that Shutterstock is offering their images for sale without authorization, Shutterstock's practice is to not terminate licenses they have purportedly granted to others.

111.   When a copyright holder reports to Shutterstock that Shutterstock is offering their images for sale without authorization, Shutterstock's practice is to keep the revenue they have received from sales of that work.

112.    Shutterstock has many different pricing options for purchasing images.

113.    The page <https://www.shutterstock.com/pricing> on the Shutterstock Website (the "Pricing Page") stated: "Get the ideal image plan for your projects."

114.    Shutterstock offers subscription-based plans with monthly fees.

115.    Shutterstock offers "enhanced packs" of two, five, or 25 images for $199, $449, or $1,699 respectively, which come with an Enhanced License. Shutterstock advertises its "2 pack" version of the "enhanced pack" as being "$99.50 per image."

116.    Shutterstock's subscription offerings vary based on the page or website navigation pathway that a prospective customer uses to begin the process of signing up.

117.    The Pricing Page on the Shutterstock Website states that subscription-based plans with monthly fees begin at $49 per month for a single person, which includes 10 images per month. The Shutterstock Website describes this plan with the text: "$4.90/image."

118.    The Pricing Page on the Shutterstock Website states that the company's subscription-based plans also include a $249 per month option for a single person, which includes 750 images per month. The Shutterstock Website describes this plan with the text: "$0.33/image."

119.    Shutterstock displays next to images offered on its website: "Get this image for FREE." However, this text is a reference to Shutterstock offering a free trial to its subscription plans. If that trial expires, the customer is automatically enrolled in a plan with an annual commitment.

120.    Shutterstock placing the word "FREE" next to Plaintiffs' Photographs devalues that artwork.

121.    Shutterstock is a sophisticated company.

122.    Shutterstock has employees who principally reside in Minnesota.

## III.    Plaintiffs discovered Shutterstock was infringing their Photographs[1]

### (A)    Shutterstock offered Plaintiffs' Photographs for sale through their website and mobile applications

123.    Plaintiffs discovered that Shutterstock was displaying, copying, and offering for sale many of its copyrighted Photographs for which Shutterstock had neither permission nor license. Mr. Webster spent many days, working late into the night, to investigate Shutterstock's infringement scheme. As the investigation progressed, he continued to find more and more of Plaintiffs' copyrighted Photographs on Shutterstock's Website, then totaling at least 111 images. These Photographs are identified in pages 1 through 111 in Exhibit A (hereafter the "First Set of Photographs" or "111 Photographs").

124.    Shutterstock made copies of each of the Photographs.

125.    Shutterstock displayed the Photographs for its financial benefit.

126.    By way of example, Shutterstock copied the Kettle River Photo to their servers and displayed the Kettle River Photo on the Shutterstock Website.

127.    Shutterstock did not have the right to copy or display any of the Photographs.

128.    Shutterstock offered each of the Photographs for sale.

---

[1] There are 112 photographs in suit: 111 were the subject of cease-and-desist letters in March 2020 and September 2020, and Shutterstock began infringing the 112th image in late 2020, as later described.

129.   By way of example, Shutterstock offered the Kettle River Photo for sale via the Shutterstock Website in exchange for money.

130.   Shutterstock did not have the right to offer any of the Photographs for sale.

131.   JPEG is a common file type for images including photographs and may also be referred to as "JPG" or "image/jpeg".

132.   Shutterstock offered each of the Photographs for download.

133.   Shutterstock offered to make copies of the Photographs for others.

134.   By way of example, Shutterstock offered to initiate a file transfer via web browser of a downloadable JPG file of the Kettle River Photo.

135.   Shutterstock did not have the right to offer any of the Photographs for download or to make copies of the Photographs for others.

136.   Shutterstock offered the Photographs to others for financial gain.

137.   Shutterstock offered the Photographs for its own business advantage.

138.   Shutterstock offered licenses allowing others to copy the Photographs.

139.   Shutterstock did not have a license to display any of the Photographs.

140.   Shutterstock did not have permission to display any of the Photographs.

141.   Shutterstock did not have the authority to grant licenses to the Photographs.

142.   Shutterstock did not have the right to reproduce any of the Photographs.

143.   Shutterstock did not have the right to create derivative works of any of the Photographs.

144.   Shutterstock did not have the right to distribute any of the Photographs.

145.   Shutterstock did not have the right to display any of the Photographs.

146.    Shutterstock did not have the right to modify any of the Photographs.

147.    Neither Plaintiff provided Shutterstock the Photographs.

148.    Neither Plaintiff uploaded the Photographs to Shutterstock.

149.    Shutterstock has not responded to Plaintiffs' demands to provide the identity of the person(s) who purportedly uploaded the Photograph(s) to the Shutterstock Website.

150.    Shutterstock approved each of the Photographs for display on the Shutterstock Website.

151.    Shutterstock accepted each of the Photographs for display on the Shutterstock Website.

152.    Shutterstock claimed that each of the Photographs were their intellectual property.

153.    Shutterstock added a copyright notice below each of the Photographs which stated: "© 2003-2020 Shutterstock, Inc." or "© 2003-2021 Shutterstock, Inc."

154.    Shutterstock made representations and warranties to third parties that it had "all necessary rights in and to" Plaintiffs' Photographs.

155.    Shutterstock made representations and warranties that its customers' use of Plaintiffs' Photographs would not infringe any copyright or violate any United States law.

156.    Shutterstock made false representations to its customers regarding Plaintiffs' Photographs.

157.    Shutterstock has not responded to demands in ten U.S. Certified Mail letters that Shutterstock identify anyone it sold, licensed, or distributed the Photograph(s) to.

158.    All purported licenses to the Photographs which Shutterstock granted to others violate Plaintiffs' rights.

159.    Shutterstock set the pricing on imagery (including the Photographs) displayed on the Shutterstock Website.

160.    The purported Contributor who uploaded the Photographs did not set the price at which Shutterstock offered those Photographs for sale.

161.    When a photograph is sold on the Shutterstock Website, Shutterstock is the seller and licensor.

162.    When a photograph is licensed via the Shutterstock Website, Shutterstock enters into a license agreement with their customer, and the purported Contributor is not a party to that agreement.

163.    When a photograph is sold on the Shutterstock Website, Shutterstock or its financial services vendor processes the customer's credit card transaction.

164.    Shutterstock pays Contributors a portion of the revenue received from sales. Shutterstock always keeps at least 60% of the revenue, but sometimes keeps at much as 85% of the revenue.

165.    Shutterstock does not reveal to its Contributors the name or contact information of persons who have purchased or obtained licenses.

166.    When a person downloads imagery from the Shutterstock Website, Shutterstock does not reveal to the Contributor that person's intended use of the work.

167.    The Shutterstock Website states: "Our database features over 232 million royalty free images, each of which you can gain access to by purchasing one of our flexible subscription plans."

168.    Shutterstock provided those who purchased one of their subscription plans access to download Plaintiffs' Photographs.

169.    There are two principal types of licenses in the photography industry. "Royalty-free" licensing is a scheme by which a licensor charges a licensee a fee for a broad spectrum of uses and across mediums, while "rights-managed" is a scheme by which a licensor charges a licensee a fee for use of an image for a particular purpose.

170.    Plaintiffs did not choose or direct that any of the Photographs be marketed as "royalty-free."

**(B)    Shutterstock added its watermark over Plaintiffs' Photographs to falsely claim them as their intellectual property**

171.    When Shutterstock displayed Plaintiffs' Photographs, Shutterstock modified the images to add a watermark of its corporate logo over those Photographs.

172.    Shutterstock added its watermark over the Photographs to claim them as their intellectual property.

173.    Shutterstock added its watermark over Plaintiffs' Photographs to restrict use of the Photographs according to their own business terms.

174.    After a Shutterstock customer purchases an image from Shutterstock, Shutterstock removes the watermark in the digital image file which Shutterstock distributes to that customer.

24

175.    Shutterstock has stated: "We sell images, which is why there's a watermark on them."

176.    Shutterstock applies watermarks on imagery to exert control.

177.    Shutterstock applies watermarks on imagery for a financial benefit.

178.    Shutterstock applies watermarks on imagery to protect their profits.

179.    Shutterstock applies watermarks on imagery to induce others to make a purchase so the watermarks will be removed.

180.    Shutterstock has stated: "We can definitely help you to save time and to avoid copyright infringement issues! Once you license our image it can be downloaded without watermark..."

181.    A watermark is copyright management information.

182.    Watermarks do not prevent all instances of downstream infringement.

183.    A Shutterstock representative was recorded stating "Unauthorized use by someone who has not purchased a license to your work may be the most common use that we see. Examples of this might include use of a watermarked image."

(C)    **Shutterstock removed Plaintiffs' copyright management information**

184.    Shutterstock possessed copies of the Photographs which contained copyright management information in the metadata, including the name of the photographer, their email address, their phone number, copyright flags, timestamps, geographic coordinates, camera equipment data, credit lines, and a copyright notice.

185.    Shutterstock used some of Plaintiffs' metadata—such as Photograph descriptions—while discarding or disregarding metadata which contained CMI or identified Mr. Webster as the creator of the works.

186.    A way to protect images is to add CMI to the metadata.

187.    When a Contributor uploads imagery to the Shutterstock Website, Shutterstock removes or strips data present in the copyright metadata fields.

188.    Shutterstock stripped, removed, or overwrote Plaintiffs' copyright management information in the metadata of the Photographs.

189.    Shutterstock possessed metadata in one or more of the images identified in Exhibit A which contained the text "Tony Webster."

190.    Shutterstock possessed metadata that is or was in one or more digital files which contained the text "© 2018 Tony Webster."

191.    Prior to February 1, 2021, Shutterstock possessed the text "Copyright (c) 2018 Tony Webster. All rights reserved." in a file, metadata, electronic medium, HTTP POST data, database, or computer system.

192.    Shutterstock did not display Mr. Webster's name or any of Plaintiffs' copyright notices on the Shutterstock Website.

193.    Shutterstock collects camera make and model information from images uploaded by purported Contributors.

194.    Shutterstock possessed metadata indicating at least one of Plaintiffs' Photographs was captured using a Sony a7R III, a/k/a ILCE-7RM3, digital camera.

195.     Shutterstock has analyzed the number of photograph submissions and approval rate by camera model.

196.     Shutterstock has calculated the number of photograph submissions and approval rate by camera model by analyzing image metadata.

197.     When a Shutterstock customer purchased an image license from Shutterstock and obtained a downloaded JPG file, the JPG file did not contain any CMI.

198.     Shutterstock has the technical capability to choose which metadata fields to keep or remove in JPG files they distribute to their customers.

199.     An image credit shares information about the source of the image.

200.     An image credit helps protect the licensor's and photographer's rights and ability to further license the image.

201.     Shutterstock did not display or distribute Plaintiff(s) image credit or copyright notices for any of the Photographs.

**(D)     Shutterstock assigned an ID number to each of the Photographs**

202.     Each image offered on the Shutterstock Website is assigned by Shutterstock a unique ID number, known as the "Shutterstock ID," "stock photo ID," "asset ID" or "mediaId" (the "Shutterstock ID").

203.     By way of example, one of Shutterstock's uses of the Kettle River Photo was assigned by Shutterstock the Shutterstock ID 1310275612.

204.     The Shutterstock ID is displayed below imagery offered on the Shutterstock Website, and is displayed above imagery in the Shutterstock iPhone application.

205.    On a page of the Shutterstock Website which displayed the Kettle River Photo, the following text appeared visually below the image: "Royalty-free stock photo ID: 1310275612".

206.    Each photograph offered on the Shutterstock website has its own webpage (the "Detail Page" or "Image Page"). By way of example, the Kettle River Photo was visible on the Shutterstock Website at the URL <https://www.shutterstock.com/image-photo/kettle-river-winds-through-st-croix-1310275612>.

207.    The Shutterstock ID was displayed within URLs for imagery displayed on the Shutterstock Website. By way of example, in the Kettle River Photo Detail Page URL, the Shutterstock ID appears as "1310275612".

208.    The Shutterstock Website has a search field, which allows visitors to the website to search the photography available for licensing on Shutterstock's Website by words used in the title, description, keywords, or Shutterstock ID.

209.    Entering a Shutterstock ID in the search field on the Shutterstock Website homepage will bring a person directly to the image matching that Shutterstock ID.

210.    Shutterstock edited the Photographs to add a Shutterstock ID to them.

211.    A Shutterstock ID is copyright management information.

**(E)    Shutterstock copied Plaintiffs' image descriptions, which they obtained by ingesting metadata**

212.    At the time of Mr. Webster's initial publication of the Kettle River Photo, Mr. Webster wrote the following caption for the Kettle River Photo: "The Kettle River winds through St. Croix State Park, as seen from the Maple Island Landing on a winter

afternoon sunset." This caption was visually below the image and embedded within that Photograph's IPTC metadata, as originally published by Mr. Webster.

213. Shutterstock displayed the following text underneath the Kettle River Photo on the Shutterstock Website: "The Kettle River winds through St. Croix State Park, as seen from the Maple Island Landing on a winter afternoon sunset."

214. Shutterstock did not write, draft, or otherwise create the following sentence: "The Kettle River winds through St. Croix State Park, as seen from the Maple Island Landing on a winter afternoon sunset."

215. Shutterstock obtained the text "The Kettle River winds through St. Croix State Park, as seen from the Maple Island Landing on a winter afternoon sunset" by accessing metadata.

216. Shutterstock obtained the text "The Kettle River winds through St. Croix State Park, as seen from the Maple Island Landing on a winter afternoon sunset" from the IPTC metadata of a file a purported Contributor uploaded to the Shutterstock Website.

217. Each image offered on the Shutterstock Website is assigned a "slug."

218. A slug is commonly used by website developers and publishers to convert a given text string—such as a title, caption, or description—into text which can be used in the URL of a webpage.

219. The process of creating a slug generally removes punctuation marks such as commas or colons, removes or transliterates special characters (*e.g.* "español" may be converted to "espanol"), or replaces spaces with dashes or underscores. Additionally, sometimes filler words like "the" or "a" or "and" may be removed during the process of

creating a slug. Slugs are often truncated or limited to a certain length. A "slug" is also known as a "clean URL" or "pretty URL."

220.    URL slugs are used to increase findability and searchability of content on the Internet and can be a search engine optimization (SEO) practice.

221.    Shutterstock uses SEO specialists.

222.    The "slug" in the Kettle River Photo Detail Page URL is or includes "kettle-river-winds-through-st-croix".

223.    Shutterstock generated the slug for the page which displayed the Kettle River Photo based on the IPTC metadata present in a JPG file.

224.    Since Shutterstock commenced infringement of the Photographs, searches for Plaintiffs' image descriptions on search engines usually leads to the Shutterstock Website before, instead of, or in place of Plaintiffs' original publication of the Photographs.

**(F)     In addition to offering to sell Plaintiffs' Photographs, Shutterstock offered unlimited free try-out versions of the Photographs**

225.    Shutterstock placed the following buttons below Plaintiffs' Photographs on the Detail Pages: Save, Try, Share, and Edit:



226.   When a Shutterstock Website visitor clicked the "Try" button below a photograph appearing on the Shutterstock Website—including the Photographs in suit—Shutterstock presented them a downloadable JPG file for their use without payment.

227.   Images obtained via clicking "Try" below an image on the Shutterstock Website are also known as a "comp" or "comp image."

228.   Shutterstock's Website stated: "Before you invest in a stunning yet not-quite-right photo, try out the image or clip directly in your project before making the purchase."

229.   Shutterstock has stated: "You can download a comp with our watermark before purchasing the image from the image page."

230.   Shutterstock's Website stated: "Whether you want to preview your stock photo in a PowerPoint presentation or on a web page, as an ad banner or as a social media profile pic, you can do so with a drag and a drop — seriously. Just click the image you want to preview, hold it and drag it to your desktop or folder."

231.   Shutterstock or its vendors collect data which indicate how many times a person clicked 'Try' under any of Plaintiffs' Photographs on the Shutterstock Website.

232.   Shutterstock or its vendors collect data which indicate how many times any version of Plaintiffs' Photographs were downloaded from their systems or services.

**(G)   "Shutterstock Editor" feature promoted manipulations of Plaintiffs' Photographs and the creation of derivative works for advertising**

233.   Shutterstock Editor, also called Shutterstock Editor Pro, is an online application on the Shutterstock Website, which Shutterstock has described as being

"designed to simplify the process of editing Shutterstock's millions of photos and illustrations into compelling presentations, social media posts, or advertisements."

234.   Shutterstock describes Shutterstock Editor as a "simple, fast, and free way to edit photos."

235.   Shutterstock made all of the Photographs in suit available to be edited via the Shutterstock Editor application on the Shutterstock Website.

236.   Shutterstock's Website stated: "Annual plans come with Shutterstock Editor Pro, so that you can revise images to suit your creative needs."

237.   Shutterstock Editor revises images.

238.   Shutterstock Editor modifies images.

239.   Shutterstock Editor can create variations of images.

240.   Shutterstock's Website used the tagline "Our images, your style. Personalize with Shutterstock Editor."

241.   The Shutterstock Editor allowed derivative works of Plaintiffs' Photographs to be created, saved, distributed, and downloaded.

242.   Shutterstock Editor allowed Plaintiffs' Photographs to be modified via color changes, increases or decreases in saturation, contrast changes, blurring, the adding of text, the flipping or mirroring of images, cropping, and the use of filters, which are preset changes to the visual appearance of the image.

243.   When an image was loaded in the Shutterstock Editor, Shutterstock shows the image with various filters applied.

244.   By way of example, one of Plaintiffs' Photographs in the Shutterstock Editor appeared with the following options presented to the Shutterstock Website visitor:



245.   In the preceding paragraph, the Shutterstock Website visitor did not direct Shutterstock to show that Photograph with the modifications shown above.

246.   Shutterstock offers the Shutterstock Editor as a whitelabel service, allowing third-party print-on-demand companies to print photographs of imagery sourced from Shutterstock, including imagery modified by way of the Shutterstock Editor feature.

**(H)     Shutterstock allowed Plaintiffs' Photographs in to be viewed in customers' homes or businesses as wall art through an augmented reality experience, and offered licenses to print the Photographs for commercial use**

247.   The Shutterstock iPhone application allowed Plaintiffs' Photographs to be previewed in homes or businesses as wall art via use of augmented reality software. This software allowed the device owner to use a feature in the Shutterstock iPhone app, which launched the device's camera, scanned the room, and then virtually placed the Photograph on a blank surface in that room's physical environment, as seen on the phone screen.

248.    By way of example, Shutterstock allowed customers to preview Plaintiffs'

Photographs in their homes or businesses via use of their mobile application:



249.    Shutterstock displaying Plaintiffs' Photographs in their mobile application

constitutes copyright infringement.

250.    Shutterstock's placement of Plaintiffs' Photographs in augmented reality

environments constitutes copying, use, display, and distribution.

251.    Shutterstock offered licenses to Plaintiffs' Photographs which included a

grant of the right to print the images to a physical medium.

**(I)     Shutterstock programmed its website to declare to search engines that
it was the authoritative place to buy Plaintiffs' Photographs, thereby
drawing attention away from Plaintiffs' online presence**

252.    Many shoppers of photography or photography licenses use search engines

like Google, including specifically Google Images.

253. Shutterstock placed structured data, also known as microdata ("Structured Data"), in HTML markup on pages (like Detail Pages) which displayed the Photographs.

254. Search engines like Google read and interpret Structured Data.

255. Shutterstock has optimized their website and web pages with the intention of being placed in search engine results pages ahead of other websites and web pages.

256. Stock photography companies like Shutterstock can place Structured Data in the markup of pages which display images available for license, which results in Google placing a "licenseable" badge over the image, also called a licenseable images feature.

257. Shutterstock caused Google to place a "licensable" badge over Plaintiffs' Photographs on the Google Images website, which then linked to Shutterstock's Website. By way of example:



258. Shutterstock worked closely with Google on the licenseable badge feature.

259. Shutterstock described Google's licenseable badge feature as follows: "Google will highlight licensable images in the Google Images search results."

260. Shutterstock has further stated: "You can spot these images by looking for the licensable icon in the lower left-hand corner of any image."

261.   Shutterstock stated Google Images results using the licenseable badge feature include "links to view the license details and visit the site where you can obtain a license."

262.   Google reads the 'license' and 'acquireLicensePage' properties in Structured Data on web pages. If the 'license' property is declared, Google displays a badge over an image in their search results which states "Licenseable" and provides additional links in search engine results to licensing details for the given image.

263.   Shutterstock declared 'license' properties in Structured Data on Detail Pages which displayed Plaintiffs' Photographs.

264.   Shutterstock declared 'acquireLicensePage' properties in Structured Data on Detail Pages which displayed Plaintiffs' Photographs.

265.   Shutterstock declared 'thumbnailUrl' properties in Structured Data on Detail Pages which displayed Plaintiffs' Photographs.

266.   By way of example, Shutterstock included the following Structured Data on a Detail Page which displayed one of Plaintiffs' Photographs:

```
"thumbnailUrl":"https://image.shutterstock.com/image-
photo/minnesota-usa-november-3-2020-260nw-
1851646171.jpg","acquireLicensePage":"https://www.shutterstock
.com/image-photo/minnesota-usa-november-3-2020-dome-
1851646171","license":"https://www.shutterstock.com/license"
```

267.   The thumbnailUrl in the preceding paragraph is Plaintiffs' Photograph being served from Defendants' web server as a JPG file.

268.   A 'license' Structured Data property is CMI.

269.   An 'acquireLicensePage' Structured Data property is CMI.

270.    Providing a 'thumbnailUrl' in Structured Data instructs third parties such as Google to use and display the image represented in that URL to promote a given webpage.

271.    Google displayed Plaintiffs' Photographs in Google Images search results at the direction and facilitation of Shutterstock.

272.    Google's website for the licenseable badge feature quotes Paul Brennan, VP of Content Operations for Shutterstock, as stating: "Google Images' new features help both image creators and image consumers by bringing visibility to how creators' content can be licensed properly."

273.    Shutterstock's use of the Google licenseable badge feature amplified, highlighted, and promoted Shutterstock's stolen and infringed versions of Plaintiffs' Photographs for which Plaintiffs would never be compensated or credited, while causing a demotion to the online presence for the genuine original Photographs.

**(J)    Shutterstock entered into a partnership with TinEye to direct searches for Plaintiffs' Photographs directly to Shutterstock**

274.    TinEye is a website which offers a reverse image search service. Persons who have seen a photo online can use TinEye to find the copyright owner. Additionally, copyright owners can use TinEye to find where their work has been displayed on the internet, including potentially infringing uses.

275.    TinEye can be used to search for images which are visually the same or similar to other images.

276.    Shutterstock has caused the images they sell, including the Photographs, to be added to TinEye Image Collections.

277.   Shutterstock has entered into a contractual relationship with TinEye.

278.   When an image that Shutterstock sells is searched in TinEye, a link to the Detail Page on the Shutterstock Website appears near the top on the search results page.

279.   By way of example, when searching for one of Plaintiffs' Photographs on TinEye, the very first result is:



280.   TinEye's website states the following: "TinEye has a special feature called 'Image Collections'. These are instances where TinEye can point you to the copyright owner of the image and provide a link to where you can find that information . . . The link takes you to a page where you can learn more about the image, its owner and use permissions. The example above shows the image belongs to Stutterstock *[sic]*, a stock image site."

281.   Shutterstock caused Plaintiffs' Photographs to be displayed by TinEye.

282.   Shutterstock distributed Plaintiffs' Photographs to TinEye.

283.   Shutterstock falsely represented itself as the copyright owner of Plaintiffs' Photographs on the TinEye website.

284.   Shutterstock is a customer of TinEye.

285.   Shutterstock has access to use TinEye's reverse image search service.

**(K)** **Shutterstock's API and relationships with resellers, affiliates, and partners allowed many businesses to use Plaintiffs' Photographs in their own products and services**

*(1)* *Background on Shutterstock's API*

286.   Application programming interfaces ("API" or "APIs") are computing interfaces which allow computer systems or services to communicate with each other.

287.   Shutterstock offers an API as a service which software developers can integrate into software programs, websites, and workflows which require or would be aided by stock photography.

288.   Shutterstock's Website states: "The Shutterstock API allows marketing technology companies to integrate over 280 million images, video clips, and music tracks within their user workflow."

289.   Shutterstock provides pricing to their customers who desire to integrate the Shutterstock API with their software or website. By way of example, Shutterstock offers a plan with an annual commitment for 250 images per month for $499 per month, which Shutterstock advertises with the text "$1.99 per image." Shutterstock also offers custom plans for large accounts.

290.   Shutterstock's API responses include URLs to image files.

291.   Shutterstock's API responses include links to image files, which Shutterstock allows third parties to display in or on their own software or websites.

292.   Shutterstock offered Plaintiffs' Photographs to third-parties through its API.

293.   Shutterstock's API terms of service define the phrase "Content" as including images and their associated descriptions and keywords.

294. Shutterstock's API terms of service include Shutterstock's grant to third parties of a license to "make the Content available to Users of your Application."

295. Shutterstock's API terms of service require their API customer to incorporate the Shutterstock watermark on any "Preview Content."

296. Shutterstock's API terms of service state: "The Platform interfaces through which Preview Content is accessed shall include a conspicuous attribution in substantially the following form: "Powered by Shutterstock"."

297. The phrase "Powered by Shutterstock" appeared in JPG files of Plaintiffs' Photographs. By way of example, one of the Photographs distributed by HelloRF was:



298. The phrase "Powered by Shutterstock" is CMI.

299. Shutterstock offered links to image files of Plaintiffs' Photographs through its responses to API requests.

### (2)   *Shutterstock offered the Photographs for use in Facebook ads*

300. Facebook is a social networking website, used monthly by more than two billion people.

301.    Facebook allows marketers and business owners to create advertisements which are displayed to persons with a Facebook account in a web browser or mobile app. These advertisements can be created via the Facebook Ad Center on the Facebook website.

302.    When creating a Facebook Ad, Facebook prompts the advertiser to add one or more images to their advertisements and offers images from Shutterstock to select from.

303.    Shutterstock has a business relationship with Facebook.

304.    Shutterstock allowed Facebook advertisers to access, view, search, display, and use images in Facebook advertisements, including the Photographs in suit.

305.    Facebook's website states: "Thanks to Shutterstock's API and search capabilities, these images will be fully searchable and accessible directly within Facebook's ad creation tool."

306.    Shutterstock's Website states: "Facebook Ads allows advertisers to license Shutterstock images directly within their ad creation workflow. This helps them quickly create ads with stunning visuals that work."

307.    Shutterstock's website states: "This integration gives businesses millions of Shutterstock images at their fingertips when creating Facebook ad campaigns."

308.    Shutterstock makes money each time an image available on the Shutterstock Website and selected through the Facebook Ad Center is used in a Facebook advertisement.

309.    A Shutterstock employee stated: "Facebook pays us on the backend for every image used because we are boosting completion and performance rates for them."

310.    Neither Shutterstock nor Facebook had a valid license to copy, use, or display Plaintiffs' Photographs on Facebook or in Facebook ads, constituting infringement.

### (3)   Shutterstock offered Photographs for use by customers of Wix.com, a website builder for businesses

311.   Wix.com is a website builder for small businesses.

312.   Shutterstock's Website states "businesses can easily incorporate powerful royalty-free images and videos available within Wix's Website Builder and suite of marketing tools."

313.   Plaintiffs' Photographs were available in the Wix.com editor for businesses to copy, use, and display on their websites.

314.   Shutterstock offered Plaintiffs' Photographs to Wix.com.

315.   When a Wix.com customer licenses an image offered by Shutterstock, Wix.com collects payment for the image.

316.   Shutterstock has entered into a contractual agreement with Wix.

317.   Neither Shutterstock nor Wix.com ever had a valid license to the Photographs.

### (4)   Shutterstock allowed 'authorized partners' like PuzzlePix to offer, display, promote, and sell the Photographs worldwide

318.   Shutterstock's Website states: "Shutterstock Partners earn money by selling our vast collection of high quality royalty-free content to your customers."

319.   Shutterstock's Website states: "To be considered as a creative reseller partner, companies must provide a business plan for achieving at least USD $100K in Shutterstock sales in their first year."

320.   By way of example, Shutterstock provided the Photographs to a company which operates the website <http://shutterstock.puzzlepix.hu/> (the "PuzzlePix Website").

321.    The PuzzlePix Website states they are an authorized Shutterstock Partner.

322.    Shutterstock entered into an agreement with PuzzlePix.

323.    The PuzzlePix Website displayed Plaintiffs' Photographs.

324.    The PuzzlePix Website offered Plaintiffs' Photographs for sale.

325.    Neither PuzzlePix nor Shutterstock had permission or license to use, copy, display, distribute, or offer for sale or download the Photographs on the PuzzlePix Website.

### (5)    *Shutterstock provided the Photographs to a company in China who offered them for as little as 29 cents each*

326.    Shutterstock provided the Photographs to a company named either ZCool or HelloRF (hereafter interchangeably referred to as "ZCool" or "HelloRF"), who operates the website <https://www.hellorf.com/> (the "HelloRF Website").

327.    Shutterstock has invested in ZCool.

328.    Shutterstock issued a press release describing ZCool as "China's leading creative social network and artist platform with nearly six million registered users."

329.    Shutterstock issued a press release stating that "ZCool has been the exclusive distributor of Shutterstock's creative content in China since 2014."

330.    The HelloRF Website offered Plaintiffs' Photographs for sale.

331.    By way of example, the page <https://www.hellorf.com/image/show/1310357692> (the "HelloRF Page") as of February 1, 2021 displayed Plaintiffs' Photograph depicting golden-colored tall grasses in a field at St. Croix State Park in Minnesota (the "Golden Field Photo").

332.    Shutterstock provided the Golden Field Photo to HelloRF.

333.   The number "1310357692" in the HelloRF Page URL is a Shutterstock ID number, and was assigned by Shutterstock.

334.   Shutterstock exported Plaintiffs' Photographs from the U.S. to China.

335.   The HelloRF Page displayed the image file of the Golden Field Photo from the URL <https://hellorfimg.zcool.cn/preview/1310357692.jpg>.

336.   The URL <https://hellorfimg.zcool.cn/preview/1310357692.jpg> is hosted on a server, system, or network physically located in China as of February 1, 2021.

337.   The HelloRF Page also displayed the image file of the Golden Field Photo from the URL <https://image.shutterstock.com/z/stock-photo-1310357692.jpg>.

338.   The URL <https://image.shutterstock.com/z/stock-photo-1310357692.jpg> is under Shutterstock's control.

339.   Neither ZCool nor Shutterstock had permission or license to use, copy, display, distribute, or offer for sale or download, the Photographs on the HelloRF Website.

### (6)   *Shutterstock allowed affiliates like Avopix to display the Photographs and earn a commission for each sale*

340.   Shutterstock provided the Photographs to affiliates, like an unknown company who operates the website <https://avopix.com/> (the "Avopix Website").

341.   The Avopix Website displayed Plaintiffs' Photographs.

342.   Neither Avopix nor Shutterstock had permission or license to use, copy, display, distribute, or offer for sale or download, the Photographs on the Avopix Website.

343.   The images on the Avopix Website, including the Photographs, are accessed from or served from computer servers or networks physically located in Minnesota.

**(M)** **Shutterstock used Plaintiffs' Photographs in their own advertisements on third-party websites**

344.   Shutterstock copied, used, and displayed Plaintiffs' Photographs in advertisements for Shutterstock.

345.   Shutterstock caused Plaintiffs' Photographs to appear on third-party websites in advertisements.

346.   By way of example, Plaintiffs' Photograph depicting a winter sunset on the St. Louis River at Jay Cooke State Park, Minnesota, was displayed in an advertisement for Shutterstock on a website not controlled or owned by Shutterstock.

347.   Some of Plaintiffs' Photographs were copied from Shutterstock to the webhost "pix.us.criteo.net".

348.   Criteo is an advertising company whom Shutterstock pays to run advertisements on websites which Shutterstock does not operate, such as the Star Tribune.

349.   Shutterstock engages with or otherwise uses Criteo for its advertising.

**(N)** **Shutterstock's Website included instructions to third parties to copy and use the Photographs in promotion of Shutterstock's business**

350.   The Shutterstock Website included on each Detail Page an instruction to third parties to use Plaintiffs' Photographs whenever the Detail Page is presented or shared by that third-party.

351.   By way of example, one of the Detail Pages for one of the Photographs in suit included the following HTML markup:

```
<meta data-react-helmet="true" name="og:image"
content="https://image.shutterstock.com/image-
photo/minnesota-usa-november-3-2020-600w-1851646171.jpg"/>
```

352.    The HTML markup in the preceding paragraph instructs third parties to use the image file referenced therein when presenting the Detail Page as a link.

353.    By way of example, Facebook and Twitter both displayed on their websites Plaintiffs' Photographs in connection with the Shutterstock Website:

 

354.    Neither Facebook nor Twitter had a valid license to display the Photographs from Shutterstock's Website.

355.    Shutterstock promoted the distribution of Plaintiffs' Photographs through the 'Share' button it placed below each of Plaintiffs' Photographs on the Shutterstock Website.

**(O)    Shutterstock allowed the Photographs to be imported into Photoshop**

356.    Shutterstock has developed a plugin for the Adobe Photoshop image editing software. This plugin allows the searching of images for sale by Shutterstock. An image in the search result can be dragged into a Photoshop project, edited, manipulated, and fully integrated into the project, and also licensed and paid for through the Photoshop plugin.

357.    Shutterstock described the Photoshop plugin as follows: "Download the Shutterstock plugin to search, edit, and purchase images without leaving Adobe Photoshop. Create without commitment by editing watermarked images for free. Make as many edits as you want, and once you're happy with it, purchase the image."

358.    The Shutterstock plugin as used in Adobe Photoshop 2021 on MacOS Big Sur creates two folders on the user's computer: "licensed" and "previewed." When an image is selected and dragged into a Photoshop canvas, the Shutterstock plugin downloads that image and saves it in the "previewed" folder indefinitely, even if it is never purchased.

359.    Shutterstock made each of the Photographs available for copying, use, and display through its Adobe Photoshop plugin.

360.    The Shutterstock plugin for Adobe Photoshop downloads and makes copies of images to the user's disk drive.

361.    The local disk drives of Adobe Photoshop users are not an online service.

**IV.     Shutterstock defied Itasca's first round of cease-and-desist letters**

362.    On or about March 2, 2020, Plaintiffs mailed four copies of a two-page letter with a 10-page enclosure (the "First Letter") to Shutterstock via U.S. Certified Mail at the following addresses:

Letter No. 1:    Shutterstock, Inc., Empire State Building, 350 Fifth Avenue, 21st Floor, New York, NY 10118;

Letter No. 2:    Sejal Patel, Shutterstock, Inc., 350 Fifth Avenue, 21st Floor, New York, NY 10118;

Letter No. 3:    Shutterstock, Inc., c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808; and

Letter No. 4:    Shutterstock, Inc., c/o Corporation Service Company, 2345 Rice Street, Suite 230, Roseville, MN 55113.

363.    All four copies of the First Letter were delivered as addressed, and Plaintiffs received USPS Electronic Delivery Confirmation and Certified Mail return receipts.

364.     Shutterstock's Website stated on March 2, 2020 and continues to state as of February 1, 2021 that Shutterstock's mailing address is Shutterstock, Inc., Empire State Building, 350 Fifth Avenue, 21st Floor, New York, NY 10118.

365.     Shutterstock's address on file with the U.S. Copyright Office DMCA Designated Agent Directory at all times between June 8, 2017 and February 1, 2021 was: Shutterstock, Inc. 350 Fifth Avenue, 21st Floor, New York, NY 10118.

366.     Shutterstock's Designated Agent on file with the U.S. Copyright Office at the time the First Letter was sent, and covering the entire period of June 8, 2017 through October 9, 2020 was: Sejal Patel, Shutterstock, Inc., 350 5th Ave., 21st Floor, New York, NY 10118.

367.     Sejal Patel was Shutterstock's DMCA Designated Agent from December 19, 2017 to October 9, 2020.

368.     Sejal Petal is a licensed attorney and has been employed at Shutterstock since approximately 2012. Ms. Patel served as Shutterstock's Head of Intellectual Property Compliance from approximately 2012 to approximately 2015. Ms. Patel then became Shutterstock's Senior Counsel for Intellectual Property and Litigation from approximately February 2015 to March 2018. Ms. Patel then became Shutterstock's Assistant General Counsel for Intellectual Property and Litigation from approximately February 2018, a role she remains in at the time of the filing of this complaint.

369.     Shutterstock regularly receives mail addressed to: Shutterstock, Inc., Empire State Building, 350 Fifth Avenue, 21st Floor, New York, NY 10118.

370.   Shutterstock regularly receives mail addressed to: Shutterstock, Inc., 350 Fifth Avenue, 21st Floor, New York, NY 10118.

371.   Shutterstock regularly receives mail addressed to: Sejal Patel, Shutterstock, Inc., 350 5th Ave., 21st Floor, New York, NY 10118.

372.   Shutterstock appointed Corporation Service Company at 2345 Rice Street, Suite 230, Roseville, MN 55113 as its registered agent in Minnesota.

373.   Shutterstock's registered agent in Minnesota received the First Letter on March 5, 2020.

374.   Shutterstock received the First Letter on March 5, 2020.

375.   Shutterstock received a letter from Itasca on or about March 5, 2020.

376.   Shutterstock appointed Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808, as its registered agent in Delaware.

377.   Shutterstock's registered agent in Delaware received the First Letter on March 6, 2020.

378.   Shutterstock received the First Letter at their New York City office on March 13, 2020.

379.   Sejal Petal, or an authorized agent of Shutterstock, additionally received the First Letter on March 6, 2020.

380.   The First Letter included Itasca's name, address, and telephone number.

381.   The First Letter identified Mr. Webster as the photographer of each of the 111 Photographs.

382.   The First Letter identified Mr. Webster as Itasca's managing member.

383.   The First Letter contained Mr. Webster's signature.

384.   The First Letter identified 111 Photographs by U.S. Copyright Office registration number, descriptive text, and included a copy of each of the Photographs.

385.   The First Letter included the Shutterstock ID number for each image Shutterstock was offering the 111 Photographs for sale under.

386.   The First Letter included URLs to pages on the Shutterstock Website where Shutterstock was displaying the 111 Photographs.

387.   The First Letter stated neither Itasca nor Mr. Webster had not entered into any agreement with Shutterstock for the sale and distribution of the 111 Photographs.

388.   The First Letter stated Shutterstock was infringing the 111 Photographs.

389.   The First Letter included the statement: "We demand you (and anyone you provided the photographs to) immediately cease and desist all use, copying, display, licensure, offering for download, or sale of these and any of our other photographic works, and conduct a thorough investigation."

390.   The First Letter demanded Shutterstock identify everyone they licensed or sold the 111 Photographs to, along with their contact information and information about their profits in the Photographs.

391.   The First Letter stated it placed Shutterstock on notice of a claim for copyright infringement and copyright management information violations, and demanded Shutterstock preserve and retain all relevant records.

392.   The First Letter contained every piece of information necessary for Shutterstock to cease infringement.

393.   A Shutterstock ID number is sufficient information for Shutterstock to identify an image on the Shutterstock Website.

394.   A Shutterstock Website URL is sufficient information for Shutterstock to identify an image on the Shutterstock Website.

395.   Shutterstock continued to display each of the 111 Photographs over six months after their receipt of the First Letter.

396.   By way of example, attached hereto as **Exhibit C** is a true and correct copy of Shutterstock's Website continuing to display and offer one of Plaintiffs' 111 Photographs (Ex. A, p. 8) for sale on September 22, 2020, over six months after Shutterstock received the First Letter.

397.   By way of example, attached hereto as **Exhibit D** is a true and correct copy of Shutterstock's website continuing to display and allow another one of the 111 Photographs (Ex. A, p. 12) to be edited and used in advertisements as of September 22, 2020, over six months after Shutterstock received the First Letter.

398.   Shutterstock continued to copy, use, display, and promote each of the 111 Photographs after receipt of the First Letter.

399.   Shutterstock continued to offer for sale each of the 111 Photographs after receipt of the first Letter.

400.   Shutterstock did not respond to the First Letter on or before February 1, 2021.

401.   Shutterstock did not attempt to contact Itasca Images, LLC or Tony Webster at any time between March 2, 2020 and September 14, 2020.

**IV.    Six months later, Shutterstock continued to infringe Plaintiffs' Photographs, so Plaintiffs sent another round of cease-and-desist letters**

402.    On or about September 14, 2020, Plaintiffs mailed four copies of a two-page letter with a seven-page enclosure (the "Second Letter") to Shutterstock via U.S. Certified Mail at the following addresses:

Letter No. 5:    Shutterstock, Inc., 350 Fifth Avenue, 21st Floor, New York, NY 10118;

Letter No. 6:    Sejal Patel, Shutterstock, Inc., 350 Fifth Avenue, 21st Floor, New York, NY 10118;

Letter No. 7:    Shutterstock, Inc., c/o Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808; and

Letter No. 8:    Shutterstock, Inc., c/o Corporation Service Company, 2345 Rice Street, Suite 230, Roseville, MN 55113.

403.    All four copies of the Second Letter were delivered as addressed. Plaintiffs received USPS Electronic Delivery Confirmation and Certified Mail return receipts.

404.    Shutterstock received the Second Letter on September 17, 2020.

405.    Shutterstock received a letter from Itasca on or about September 17, 2020.

406.    Sejal Patel, or an authorized agent of Shutterstock, received the Second Letter on September 17, 2020.

407.    Shutterstock's Delaware registered agent received the Second Letter on September 18, 2020.

408.    Shutterstock's New York City office received the Second Letter on September 21, 2020.

409.   Shutterstock's Minnesota registered agent received the Second Letter on September 21, 2020.

410.   Plaintiffs also sent a copy of the Second Letter via email to Shutterstock on September 17, 2020.

411.   Shutterstock received an emailed copy of the Second Letter on September 17, 2020.

412.   The Second Letter included Itasca's name, address, telephone number, and Mr. Webster's name and email address.

413.   The Second Letter identified Mr. Webster as the photographer of each of the 111 Photographs.

414.   The Second Letter identified Mr. Webster as Itasca's managing member.

415.   The Second Letter contained Mr. Webster's signature.

416.   The Second Letter identified 111 Photographs by U.S. Copyright Office registration number, descriptive text, and included a copy of each of the Photographs.

417.   The Second Letter included the Shutterstock ID number for each image Shutterstock was offering the 111 Photographs for sale under.

418.   The Second Letter stated Shutterstock was infringing the 111 Photographs.

419.   The Second Letter included the statement: "We again demand you immediately cease and desist all use, copying, display, licensure, offering for download, or sale of these and any of our other photographic works, and conduct a thorough investigation."

420.    The Second Letter demanded Shutterstock identify everyone they licensed or sold the 111 Photographs to, along with their contact information and information about their profits in the Photographs.

421.    The Second Letter placed Shutterstock on notice of a claim for copyright infringement and copyright management information violations, including damages, costs, and attorney's fees, and demanded Shutterstock preserve and retain all relevant records.

422.    As of February 1, 2021, Shutterstock continues to copy and display each of the 111 Photographs—over 10 months after Shutterstock's receipt of the Second Letter.

423.    By way of example, attached hereto as **Exhibit E** is a true and correct copy of one of the 111 Photographs (Ex. A, p. 5) continuing to be copied and displayed on Shutterstock's Website as of February 1, 2021—over 10 months after Shutterstock's receipt of the First Letter and over four months after Shutterstock's receipt of the Second Letter.

424.    Shutterstock's resellers or partners continued to display the Photographs after receipt of the Second Letter.

425.    By way of example, attached hereto as **Exhibit F** is a true and correct copy of one of the 111 Photographs (Ex. A, p. 48) continuing to be copied and displayed on the HelloRF website as of February 1, 2021—over 10 months after Shutterstock's receipt of the First Letter and over four months after Shutterstock's receipt of the Second Letter.

426.    By way of example, attached hereto as **Exhibit G** is a true and correct copy of one of Plaintiffs' Photographs (Ex. A, p. 3) still being copied, displayed from, and served from web server(s) associated with HelloRF as of February 1, 2021.

427.    By way of example, attached hereto as **Exhibit H** is a true and correct copy of one of Plaintiffs' Photographs (Ex. A, p. 56) being displayed on the Avopix website as of February 1, 2021, on the upper right side, with the Shutterstock ID "1356484259."

428.    By way of example, Shutterstock continued to copy and serve a JPG file associated with Shutterstock ID 1310275612 as of February 1, 2021.

429.    Shutterstock took no action prior to February 2, 2021 to cause any of the Photographs identified in Plaintiffs' March 2020, September 2020, or December 2020 letters to cease being served from <image.shutterstock.com>.

430.    Shutterstock is aware that images served from <image.shutterstock.com> appear on third-party websites and in search engines like Google.

431.    Plaintiffs' Photographs continued to be displayed on Bing, Google Images, and TinEye in association with Defendants' websites as of February 1, 2021.

432.    Searches for Plaintiffs' Photographs on TinEye continue to display and promote those Photographs on the Shutterstock Website as of February 1, 2021.

## VI.    In late 2020, Shutterstock began infringing another one of Plaintiffs' Photographs

433.    On Election Day—November 3, 2020—Mr. Webster traveled throughout the Twin Cities metropolitan area capturing photographs at polling places and government buildings. At sunset, Mr. Webster traveled to the Minnesota State Capitol building in St. Paul and set up a camera to take a photograph (Ex. A, p. 112, hereafter the "Capitol Photo"), which was first published on or about November 8, 2020.

434.   The Capitol Photo was captured using a $9,999 mirrorless medium format digital camera with a $2,299 lens.

435.   Mr. Webster applied for copyright registration for the Capitol Photo on November 10, 2020 within a GRPPH. The registration was timely. The U.S. Copyright Office issued the registration under Reg. No. VA 2-229-733 (the "Capitol Registration") effective November 10, 2020.

436.   On or about December 20, 2020, Mr. Webster discovered that the Capitol Photo was being displayed and offered for sale on the Shutterstock Website and app.

437.   Shutterstock added their watermark over the Capitol Photo.

438.   Shutterstock copied, used, displayed, offered for sale, offered for download, and offered for licensing the Capitol Photo.

439.   At no point did Shutterstock ever have a license to the Capitol Photograph.

440.   At no point did Shutterstock ever have the right to display the Capitol Photograph.

441.   At no point did Shutterstock ever have the right to sell the Capitol Photograph.

442.   Shutterstock allowed the Capitol Photograph to be edited.

443.   Shutterstock provided PuzzlePix the purported right to sell global, perpetual licenses to the Capitol Photo.

444.   PuzzlePix offered the licenses to the Capitol Photo for as little as $3.15.

445.   The Capitol Photograph as it was displayed on the Shutterstock Website was attributed to "Hane Street."

446.    Hane Street is the purported name of a Shutterstock "Contributor."

447.    Each purported Shutterstock Contributor has what Shutterstock calls a "Portfolio" on the Shutterstock Website, which is said to display all of that Contributor's photography, along with a photograph of the Contributor, and additional information about the purported Contributor.

448.    According to the Hane Street Portfolio on the Shutterstock Website, Hane Street uploaded at least 3,387 images to the Shutterstock Website. Shutterstock reviewed, approved, and accepted all of these 3,387 images, and offered them for licensure and sale.

449.    The bulk of these photographs have been stolen from the true artist—and there were many red flags to suggest it. By way of example, many of the 3,387 "Hane Street" photographs offered for sale had dates and locations of the photographs underneath them. These dates and locations showed improbable or impossible travel, especially during a global pandemic, and instead revealed the images had been stolen:

- June 5, 2020 in Sacramento, California;
- June 13, 2020 in Latvia;
- June 16, 2020 in both Germany and Taiwan at the same time;
- June 17, 2020 in Austria;
- June 20, 2020 in Germany;
- June 23 and 26, 2020 in Austria;
- June 27, 2020 in Belgium;
- June 28, 2020 in both Taiwan and Toronto, Canada at the same time;
- July 1, 2020 in Taiwan;
- July 3, 2020 in South Carolina;
- July 5, 2020 in Austria;
- July 9, 2020 in Germany;
- July 16, 2020 in South Carolina again;
- July 21, 2020 in Austria;

- July 22, 2020 in both Germany and Taiwan at the same time;
- July 24, 2020 in Germany;
- July 25, 2020 in France;
- August 3, 2020 in both Australia, Taiwan, and Kyoto on the same day;
- August 6, 2020 in South Carolina again;
- August 9, 2020 in Japan.

450.    Many of the photographs attributed to Hane Street had details that did not match the stated geographical location. For example, photographs said to have been taken in a coastal Taiwanese city depicted vehicles with license plates from Germany or Georgia (United States); photographs said to be taken in a coastal port city showed snowy mountainous terrain; and photographs said to be taken in Taiwan showed the Atlanta, Georgia skyline in the background.

451.    There were many signs that Hane Street is a fake name, does not actually exist, and that all or most of the photographs attributed to Hane Street were infringements.

452.    On the Hane Street Portfolio on the Shutterstock Website, Hane Street is depicted as being a woman smiling with falling snow in the background:



453.    This purported image of Hane Street is itself a stock photograph, and appears many times across the Internet, in advertisements for skin care products, an immigration consulting firm, and dermatologist.

454.    The Hane Street Shutterstock Portfolio links to a LinkedIn and Facebook profile—neither of which actually exist—and also links to <HANESTREET.COM>, a domain name that at no time prior to February 1, 2021 had ever been registered.

455.    The Hane Street Shutterstock Portfolio states that Hane Street is in Taiwan. However, the Hane Street Shutterstock Portfolio contains a link to a Twitter account, @hanestreet, which identifies Hane Street as being in Bangladesh.

456.    On or about December 21, 2020, Mr. Webster mailed two copies of a one-page letter with four-page enclosure by U.S. Certified Mail (the "Capitol Photo Letter") to:

Letter No. 9:    Shutterstock, Inc., Legal Department, 350 5th Ave., 21st Floor, New York, NY 10118; and

Letter No. 10:    Shutterstock, Inc., Sejal Patel, 350 5th Ave., 21st Floor, New York, NY 10118.

457.    Both copies of the Capitol Photo Letter were delivered as addressed, and Plaintiffs received USPS Electronic Delivery Confirmation and USPS Certified Mail return receipts for both.

458.    Shutterstock changed its DMCA Designated Agent registration with the U.S. Copyright Office on or about October 9, 2020. Shutterstock's DMCA Designated Agent address beginning October 9, 2020 to present is: Legal Department, Shutterstock, Inc., 350 5th Ave., 21st Floor, New York, NY 10118.

459.    The Capitol Photo Letter was properly addressed to Shutterstock's DMCA Designated Agent.

460.    Shutterstock's DMCA Designated Agent received the Capitol Photo Letter on December 28, 2020.

461. Shutterstock received the Capitol Photo Letter on December 28, 2020.

462. Shutterstock received a letter from Tony Webster on December 28, 2020.

463. Sejal Patel, or an authorized agent, received the Capitol Photo Letter on December 28, 2020.

464. The Capitol Photo Letter included Mr. Webster's name, address, phone number, and email address.

465. The Capitol Photo Letter was signed and dated by Mr. Webster.

466. The Capitol Photo Letter included the Shutterstock Detail Page URL and Shutterstock ID corresponding to Shutterstock's display of the Capitol Photo.

467. The Capitol Photo Letter demanded Shutterstock cease all use, copying, display of, and access to Shutterstock ID 1851646171.

468. As of February 1, 2021, Shutterstock is continuing to use, copy, display, offer for sale, offer for license, and offer for download the Capitol Photograph.

469. Attached hereto as **Exhibit I** is a true and correct screen capture dated February 1, 2021 showing the Capitol Photo being copied, used, and displayed on the Shutterstock Website—35 days after Shutterstock received a cease-and-desist demand.

470. Attached hereto as **Exhibit J** are true and correct screen captures dated February 1, 2021 showing the Capitol Photo in the Shutterstock Editor.

471. Attached hereto as **Exhibit K** is a true and correct screen capture dated February 1, 2021 showing Capitol Photo being copied, used, and displayed in the Shutterstock iPhone mobile application.

472.   Attached hereto as **Exhibit L** is a true and correct screen capture dated February 1, 2021 showing Shutterstock continues to allow the Capitol Photo to be displayed on prospective customers' home and business walls via an augmented reality experience in the Shutterstock iPhone mobile application.

473.   Attached hereto as **Exhibit M** is a true and correct screen capture dated February 1, 2021 showing the Capitol Photo being displayed at the URL <https://image.shutterstock.com/image-photo/minnesota-usa-november-3-2020-600w-1851646171.jpg>.

474.   Attached hereto as **Exhibit N** is a true and correct screen capture dated February 1, 2021 showing the Capitol Photo being displayed on the PuzzlePix website.

475.   Attached hereto as **Exhibit O** is a true and correct screen capture dated February 1, 2021 showing the Capitol Photo being displayed from HelloRF webserver(s).

476.   Attached hereto as **Exhibit P** is a true and correct screen capture dated February 1, 2021, showing the Capitol Photo being displayed in Google Images with the 'licenseable' badge displayed, in connection with the Shutterstock Website.

477.   Attached hereto as **Exhibit Q** is a true and correct screen capture dated February 1, 2021 showing the Capitol Photo still being offered by Shutterstock through its Adobe Photoshop plugin.

478.   Shutterstock has sold "Hane Street" images to the Chicago Tribune, New York Daily News, The Active Times, International Railway Journal, JOC.com, and others.

479.   Shutterstock continued to display Shutterstock ID 1851646171 as of February 1, 2021.

480.    Shutterstock allowed the purported "Hane Street" Contributor to upload even more images following Shutterstock's receipt of Mr. Webster's December 2020 letter.

## VIII.    Shutterstock's copyright infringement has permanently damaged Plaintiffs' rights in the Photographs

481.    As of February 1, 2021, Shutterstock continued to display all 112 Photographs in suit.

482.    As of February 1, 2021, Shutterstock has still not informed Plaintiffs of who it distributed the Photographs in suit to.

483.    As of February 1, 2021, Shutterstock has still not informed Plaintiffs of whether they have taken steps to ensure others have stopped copying, display, or use of the Photographs.

484.    The value of Plaintiffs' Photographs has been permanently weakened by Shutterstock's actions as described in this complaint.

485.    Plaintiffs' Photographs as they appeared in search engines has been de-ranked or completely unlisted due to the availability of the images on Shutterstock's Website.

## CAUSES OF ACTION

### COUNT I
### Copyright Infringement (17 U.S.C. § 501)

486.    Plaintiffs incorporate by reference the allegations in the paragraphs above.

487.    Defendants' conduct is in violation of United States copyright law and the exclusive rights held by Plaintiffs.

488.    Defendants' continued unauthorized use of the Photographs after being notified by Plaintiffs that such use is unauthorized constitutes willful and intentional infringement of Plaintiffs' rights.

489.    Defendants' infringement of these rights was and is willful.

490.    As a result of Defendants' acts of copyright infringement, and the foregoing allegations, Plaintiffs have suffered damages in an amount to be determined at trial.

491.    Defendants' continued unauthorized use of the Photographs has caused Plaintiffs irreparable harm, for which Plaintiffs have no adequate remedy at law.

492.    Plaintiffs are entitled to actual or statutory damages under the Copyright Act at their election.

## COUNT II
### False Copyright Management Information (17 U.S.C. § 1202(a))

493.    Plaintiffs incorporate by reference the allegations in the paragraphs above.

494.    Defendants displayed and distributed Plaintiffs' Photographs with false metadata and false copyright management information.

495.    Defendants' falsification of CMI was done knowingly and with an intent to induce, enable, facilitate, or conceal infringement.

496.    Defendants' falsification of Plaintiffs' copyright management information constitutes violations of 17 U.S.C. § 1202(a).

## COUNT III
### Removal or Alteration of Copyright Management Information (17 U.S.C. § 1202(b))

497.    Plaintiffs incorporate by reference the allegations in the paragraphs above.

498.   Defendants removed and altered Plaintiffs' CMI.

499.   Defendants' removal and alteration of Plaintiffs' CMI was intentional.

500.   Defendants distributed, displayed, and performed the Photographs knowing the CMI had been removed or altered without the authority of the copyright owner.

501.   Defendants displayed and distributed Plaintiffs' Photographs with removed or altered metadata and false copyright management information.

502.   Defendants had reasonable grounds to know that removal or alteration of CMI would induce, enable, facilitate, or conceal infringement,

503.   Defendants' removal and alteration of Plaintiffs' copyright management information constitutes violations of 17 U.S.C. § 1202(b).

## COUNT IV
## Contributory and Vicarious Copyright Infringement

504.   Plaintiffs incorporate by reference the allegations in the paragraphs above.

505.   Defendants induced, caused, and materially contributed to the infringing acts of others by encouraging, inducing, allowing, and assisting others to copy and use Plaintiffs' copyrighted Photographs, including without limitation through the copying, display, and distribution of the Photographs to third-parties, some who in turn copied, used, and displayed the Photographs again.

506.   Defendants had knowledge of the infringing acts relating to the Photographs and had the right and ability to control the infringing acts of those individuals or entities who infringed Plaintiffs' Photographs.

507.    Defendants obtained a financial benefit from the infringing activities of individuals or entities who infringed Plaintiffs' copyright in the Photographs.

## JURY TRIAL DEMAND

508.    Plaintiffs demand trial by jury on all issues so triable.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs request judgment be entered against Defendants as follows:

A.    Judgment in favor of Plaintiffs and against Defendants for copyright infringement, removal of copyright management information, and for vicarious and contributory infringement;

B.    A finding that Defendant Shutterstock's infringement was willful;

C.    An award of statutory damages against Defendant Shutterstock of $30,000 per work infringed pursuant to 17 U.S.C. §§ 504-505;

D.    An award of increased statutory damages against Defendant Shutterstock for willful infringement of $150,000 per work infringed pursuant to 17 U.S.C. § 504(c)(2);

E.    A finding that each of the Doe Defendants' infringements were willful;

F.    An award of statutory damages against each Doe Defendant of $30,000 per work infringed, per infringer, pursuant to 17 U.S.C. §§ 504-505;

G.    An award of increased statutory damages against each Doe Defendant for willful infringement of $150,000 per work, per infringer, pursuant to 17 U.S.C. § 504(c)(2);

H.    A finding that Defendant Shutterstock's contributory and vicarious infringement was willful;

I.      An award of statutory increased statutory damages for willfulness against Shutterstock as to contributory and vicarious infringement for each work infringed;

J.      An award of actual and/or statutory damages, at Plaintiffs' election, for both the removal, falsification, and alteration of copyright management information pursuant to 17 U.S.C. § 1202;

K.      An award of Plaintiffs' full costs, expenses, and reasonable attorney's fees;

L.      A permanent injunction against further infringement and CMI violations;

M.      An impounding of any and all copies produced by any Defendant in violation of Plaintiffs' rights; and

N.      Such other, different, and further relief as this Court deems just and proper.


Dated:  February 2, 2021                         **TAFT STETTINIUS & HOLLISTER LLP**

                                                 By:  s/ *Scott M. Flaherty*
                                                        Scott M. Flaherty (#388354)
                                                        O. Joseph Balthazor (#399093)
                                                 2200 IDS Center
                                                 80 South Eighth Street
                                                 Minneapolis, MN  55402-2157
                                                 Telephone:   (612) 977-8400
                                                 Fax:         (612) 977-8640
                                                 Emails:      sflaherty@taftlaw.com
                                                              obalthazor@taftlaw.com

                                                 **ATTORNEYS FOR PLAINTIFFS**
                                                 **ITASCA IMAGES, LLC**
                                                 **AND TONY WEBSTER**