## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Itasca Images, LLC, and<br>Tony Webster,<br><br>               Plaintiffs,<br><br>v.<br><br>Shutterstock, Inc., et al.,<br><br>               Defendants. | Case No. 21-cv-287 (JRT/DTS)<br><br>**MEMORANDUM OF LAW<br>IN SUPPORT OF PLAINTIFFS'<br>MOTION TO COMPEL**<br><br>**(Redacted Version)** |

## INTRODUCTION

Plaintiffs Itasca Images, LLC and Tony Webster ("Plaintiffs") submit this memorandum of law in support of their motion to compel production of documents and answers to interrogatories from Defendant Shutterstock, Inc. ("Shutterstock").

This motion is the culmination of six months of Shutterstock's gamesmanship. Shutterstock has been exceptionally uncooperative with the discovery process by claiming that documents which obviously exist do not, by refusing to produce directly relevant material, by making incomplete or provably false statements under penalty of perjury, and by feigning burden and irrelevance at every juncture.

Plaintiffs also recently uncovered evidence showing Shutterstock advanced false statements about one of the most material facts of this case. Shutterstock's top in-house intellectual property attorney, who signed their interrogatories, has suddenly departed the company.

As of today, the discovery window is 46% over and Shutterstock has produced only eight pages in response to Plaintiffs' requests for production served 103 days ago. Shutterstock sought and received an aggressive fact-discovery timeline and is downing the ball to avoid producing relevant information showing that they have no defenses, and that Plaintiffs' case is exactly as serious as they said it was. Because of the legal and factual complexity of this case, some background is useful for understanding the present motion.

## A.    Summary of the case

Shutterstock sells stock photography to everyone from bloggers to corporate advertisers to Hollywood movie studios. (Complaint, generally.) Plaintiff Itasca Images, LLC is a photography studio, and its principal is Plaintiff Tony Webster, who created 112 photographs, most of which are artistic nature scenes from Northern Minnesota (the "Photographs"). (*Id*.) All of these 112 images were originally published by Plaintiffs with visual copyright notices stating "© All Rights Reserved" (with "Tony Webster" and the year adjacent to it) and with copyright notices embedded within the metadata, "Copyright © 20[18/19/20] Tony Webster. All rights reserved" (*E.g.*, Webster Decl. Exs. 7–8), and all were timely registered with the U.S. Copyright Office. (Complaint Ex. B.)

Plaintiffs allege Shutterstock without authorization copied these photographs into their stock photography collection, displayed the photographs on their website, stripped and falsified copyright management information ("CMI"), offered the photographs for sale, distributed them to third-parties including distribution partners and resellers, and used them in Shutterstock advertising, and distributed manipulated versions of the photographs for

use by marketers—all giving rise to claims for direct, vicarious, and contributory copyright infringement and copyright management information violations. (Complaint, generally.)

Shutterstock has pleaded 17 affirmative defenses, including the contention that Shutterstock is a "passive platform" with no liability under the Digital Millennium Copyright Act's 17 U.S.C. § 512(c) safe harbor.

**B.     Shutterstock's business model forecloses on a DMCA safe harbor defense, and Plaintiffs are entitled to discovery relevant to that defense**

Plaintiffs intend to seek summary judgment that Shutterstock is not entitled to the DMCA safe harbor. Plaintiffs intend to show in that motion that the safe harbor does not apply to Shutterstock's business model, and that even if Shutterstock was at one point entitled to the safe harbor, they lost it because they had 'red flag' and actual knowledge of infringement and failed to expeditiously cease infringement when they continued displaying and distributing the photographs for well over a year after notice. Shutterstock has recently come up with a new defense: ███████████████ resulted in Shutterstock continuing to display images long after they should have been taken down.

**(1)     Shutterstock's detailed control over the imagery they sell shows Shutterstock's infringement is not "at the direction of the user"**

Shutterstock describes their business model as: "We source high-quality content from contributors, and license that content to customers worldwide." (ECF 32-19.) Shutterstock recruits photographers to become Shutterstock Contributors, and Shutterstock "verifies" and "approves" those Contributors.[1] In this case, Shutterstock claims to have

---

[1] Shutterstock's 2018 Annual Report, https://investor.shutterstock.com/static-files/8b795c10-8df0-403b-811d-1f39f8f34393, p. 7 (last visited Aug. 19, 2021); Shutterstock's S-1 filing,

sourced the Photographs in suit from Shutterstock Contributors in Russia and Bangladesh. Shutterstock makes recommendations of the types of photography Shutterstock wants their Contributors to produce for them.[2] Shutterstock doesn't accept just any photographs from their Contributors, as the "quality of [Shutterstock's] content offerings are critical to [Shutterstock's] success".[3]

Shutterstock has suggested this curation is limited to intellectual property review; it is not. Shutterstock sets aesthetic and quality standards for the imagery they accept, rejecting images for having poor lighting,[4] being out of focus or blurry,[5] "unflattering/awkward camera angles" or other poor composition,[6] or having limited commercial value.[7] "Shutterstock has high standards and only accepts a portion of the images submitted to be included in our collection".[8]

---

https://www.sec.gov/Archives/edgar/data/0001549346/000104746912005905/a2209364zs-1.htm (last visited Aug. 19, 2021).

[2] *See, e.g.*, Webster Decl. Ex. 24, 26; "Why Were My Images Rejected and What Should I Upload?" https:// www.shutterstock.com/blog/why-were-my-images-rejected-and-what-should-i-upload (last visited Aug. 19, 2021); "Known Image Restrictions - Places and Landmarks - North and South America," https://support.submit.shutterstock.com/s/article/Known-Image-Restrictions-Places-and-Landmarks-North-and-South-America?language=en_US (last visited Aug. 19, 2021); "Known Image Restrictions - Objects and Subjects," https://support.submit.shutterstock.com/s/article/Known-Image-Restrictions-Objects-and-Subjects?language=en_US (last visited Aug. 19, 2021).

[3] Shutterstock's 2019 Annual Report and SEC 10-K filing, https://investor.shutterstock.com/static-files/5b86dd52-acfb-4601-87cd-5bf7a640608f, p. 21 (last visited Aug. 19, 2021).

[4] "Why Photos Get Rejected For Poor Lighting," https://www.shutterstock.com/blog/why-photos-get-rejected-for-poor-lighting (last visited Aug. 19, 2021).

[5] "Why was my content rejected for Focus?" https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Focus?language=en_US (last visited Aug. 19, 2021).

[6] "Angles and Lines: How to Avoid a 'Composition' Rejection" https://www.shutterstock.com/blog/rejection-reason-composition (last visited Aug. 19, 2021).

[7] "Why Images Are Rejected For Limited Commercial Value," https://www.shutterstock.com/blog/why-images-are-rejected-for-limited-commercial-value (last visited Aug. 19, 2021).

[8] "Rejection Reasons," https://www.shutterstock.com/blog/rejection-reasons (last visited Aug. 19, 2021).

One of Shutterstock's most common rejection reason is "composition," which Shutterstock describes as "one of our more subjective rejection reasons." (Webster Decl. Ex. 23 at 23:29 (Tr. at Ex. 24, p. 9).) A composition rejection is genteel way of saying ugly or weird.[9] Shutterstock rejects images that conflict with their brand image or business ventures, such as photographs depicting burning flags or monkeys in offices,[10] and photographs from red-carpet events where Shutterstock hires other photographers.[11]

When a Shutterstock Contributor uploads imagery to the Shutterstock Contributor website, those images are placed into a review queue. (Complaint ¶ 93.) Those images are not copied and displayed on Shutterstock's website until *after* Shutterstock reviews and approves them. (ECF 33-3 (Shutterstock's response to Request for Admission No. 19).) Because Shutterstock wants to maintain a collection of "world-class content",[12] the imagery Shutterstock sources from their Contributors must "meet the quality standards that we have set" (Webster Decl. Ex. 23 at 00:26 (Tr. at Ex. 24, p. 1)) and is therefore "reviewed by [Shutterstock's] curators[13], which results in an exceptional collection for marketing agencies, media organizations and businesses to create distinctive work and tell their

---

[9] "Why was my content rejected for Composition?" https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Composition?language=en_US (last visited Aug. 19, 2021).

[10] Objects and Subjects, *supra*.

[11] "Why was my content rejected for Press Credentials?" https://support.submit.shutterstock.com/s/article/Why-was-my-content-rejected-for-Press-Credentials?language=en_US (last visited Aug. 19, 2021) ("We are unable to accept content from these events because they are fully covered by Shutterstock's Editorial production and contributor teams."

[12] Shutterstock's 2020 Annual Report and SEC 10-K filing, https://investor.shutterstock.com/static-files/471ed1a5-fae2-4d3b-a7c2-6fa7e1fa2982 (last visited Aug. 19, 2021).

[13] The Court should note that "curators" is Shutterstock's term, not Plaintiffs' term.

stories".[14] Shutterstock's admitted curation is purposeful: "All of the photos have to be evaluated because everything has to be cleared for our marketplace. Our customers have expectations as to the content quality that they're looking for when it comes to the images in our collection. So we need to make sure that we keep that quality up to par, up on point. So we do this by reviewing the images that get submitted to us." (Webster Decl. Ex. 23 at 00:26 (Tr. at Ex. 24, p. 1).)

Shutterstock claims all the images they obtain from Shutterstock Contributors as their own, calling it "our content,"[15] placing Shutterstock's logo watermark over the images (Complaint ¶ 4), and Shutterstock adds their own copyright notices in the metadata of the images (Webster Decl. ¶ 10 ("Copyright (c) 2020 Shutterstock. No use without permission.")).

Though Shutterstock refers to itself as a "marketplace," Shutterstock Contributors don't set the pricing: Shutterstock does, giving the Contributor a small cut, sometimes as low as 15% and never more than 40%.[16] Shutterstock's control goes even further: they require their Contributors to get Shutterstock's written consent before pursuing any infringement remedies, declaring they have the "right and authority to take such reasonable steps to protect Shutterstock's rights in the [c]ontent." (Webster Decl. Ex. 33 at 19:06 (Tr. at Ex. 34, p. 9) and Ex. 35 (last visited July 20, 2021; Shutterstock has since removed the

---

[14] Press Release: "Shutterstock's Collection Exceeds 50 Million Images," https://www.prnewswire.com/news-releases/shutterstocks-collection-exceeds-50-million-images-300047017.html (last visited Aug. 20, 2021).

[15] S-1, *supra*.

[16] Shutterstock Contributor Earnings, https://submit.shutterstock.com/payouts (last visited Aug. 19, 2021).

video from public access.) And when Shutterstock grants their customers and business partners licenses to imagery, it is Shutterstock who is the licensor and counterparty to the agreement with Shutterstock's customer-licensees, not the Contributor. (ECF 32-17.) In fact, the Contributor can't even find out who Shutterstock has licensed the work they created to.

Shutterstock is no passive platform. Shutterstock actively selects and curates[17] the works it displays and distributes, with enormous control, thereby precluding the DMCA safe harbor defense raised by its answer.

### (2) Shutterstock is a hotbed for stolen photography and using the DMCA safe harbor to insulate their entire business

When Shutterstock onboarded new Contributors in the past, Shutterstock required them to submit to an application process with a detailed portfolio review, a requirement for submission of a government-issued photo ID, and in some cases the submission of references for foreign contributors. (Webster Decl. Exs. 1–4, 16.) Shutterstock's founder and Executive Chairman publicly commented about their sourcing of stolen photographs years ago, noting "We need to be able to have some sort of document with their [the Contributor's] name on it." (Webster Decl. Ex. 2, p. 5.) Shutterstock's former in-house counsel Sejal Patel stated that Shutterstock checked IDs "because we wanted to verify that the people who are giving us content were real people, and, you know, to deter fraud and things like that." (Webster Decl. Ex. 19 at 08:35 (Tr. at Ex. 20, p. 5.)

---

[17] Admitted by Shutterstock; denied by Shutterstock's counsel.

But recently, Shutterstock removed those guard rails while globally expanding their business. Shutterstock "streamlined" the process for their Contributors to upload imagery, and the ID check process disappeared from Shutterstock's website (*Id.*; 2018 Annual Report, *supra*; and Webster Decl. Ex. 16). Perhaps unsurprisingly, Shutterstock quickly developed a reputation expressed even in Shutterstock's own online forums[18] of being a hotbed for stolen artwork as reports of mass copyright infringement started to roll in: "[Shutterstock] is turning into a pirate site / black market free-for-all." (Webster Decl. Ex. 17, p. 33).

> **(3)     Even if Shutterstock was eligible for the DMCA safe harbor at one point, the facts of this case show extreme willfulness as Shutterstock refused to act on red flag and actual knowledge for well over a year**

Shutterstock contends that 111 of 112 of the photographs in suit were sourced from a Shutterstock Contributor in Russia (ECF 18), who may be using a fake name (Webster Decl. ¶ 27). This Shutterstock Contributor appears to have been using at least two Shutterstock Contributor accounts. One account was under both the names "The Perfect" and "PhotoElite" and Shutterstock assigned them Contributor ID number 173231604 ("Contributor The Perfect"). (ECF 33-3 (Request for Admission No. 23.)) About a year before Plaintiffs were ever aware of this infringement, Shutterstock on ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████. (ECF  36 (Interrogatory No. 3).) Shutterstock stated that ████████████████████████████

---

[18] A Shutterstock employee "[m]onitor[s] [the] forum daily to report any urgent issues or topics being discussed." (Webster Decl. Ex. 15, p. 1.)

██████████████████████ (*Id.*), and admitted the account of Contributor The Perfect

was terminated *by Shutterstock* in 2019 (ECF 33-3 (Request for Admission No. 12)).

Another account was under the name "Perfect Photo," which Shutterstock assigned

Contributor ID Number 173418454 ("Contributor Perfect Photo"). (ECF 33-3 (Request for

Admission No. 22.) Shutterstock stated that ███████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████" (ECF 36.) Shutterstock admitted that

in 2019 they also terminated Contributor Perfect Photo. (ECF 33-3 (Request for Admission

No. 10).)

But despite Shutterstock disabling and terminating the accounts of these

Shutterstock Contributors in ████████████████ *because of* ████████████████

Shutterstock continued to display, distribute, and offer for sale seemingly all the

photographs Shutterstock sourced from those Contributors, including 111 of the

Photographs in suit. In fact, Plaintiffs didn't even know about Shutterstock's infringement

of these images until 2020. (Complaint ¶ 6, 123.)

On March 2, 2020, Plaintiffs sent a cease-and-desist letter via Certified Mail to

Shutterstock's corporate office address, to Shutterstock's top in-house intellectual property

lawyer Sejal Patel (Richbourg), and to Shutterstock's registered agent Corporation Service

Company ("CSC") in both Minnesota and Delaware (the "March 2020 Letter"). (ECF 32-

1 to 32-4.) Attorney Patel served as Shutterstock's DMCA designated agent according to

both Shutterstock's website and Shutterstock's filings with the U.S. Copyright Office.

(ECF 32-11.) But Shutterstock continued to display, offer to sell, and distribute those 111 Photographs. (Complaint ¶¶ 6, 481 & Exs. E–Q.)

On September 14, 2020, Plaintiffs sent another letter to these same four recipients, with a copy via email on September 17, 2020. (ECF 32-6 to 32-10; ECF 32-15.) But Shutterstock still continued to distribute those 111 Photographs, and they were online when this lawsuit was filed in February 2021. (Complaint ¶¶ 6, 481 & Exs. E–Q.) Separately, in December 2020, Plaintiffs promptly sent yet another cease-and-desist letter after finding Shutterstock was infringing another photograph belonging to Plaintiffs. (Complaint ¶ 433–480, ECF 33-3.) Shutterstock did nothing: all the photographs Shutterstock sourced from this Shutterstock Contributor ("Hane Street" in Bangladesh) remained displayed on Shutterstock's website. (Complaint ¶¶ 433–480.)

## C.   The harm as a result of Shutterstock's infringement continues to this day

Shutterstock's years-long infringement is still harming Plaintiffs to this day. Searches for Plaintiffs' photographs online are still being directed to Shutterstock's website, and Shutterstock is running advertisements offering to sell those images as of the past week. (*E.g.*, Webster Decl. Ex. 9.) And some of the photographs in suit were, at least as of earlier this month, still online at Shutterstock's resellers and partners. (*E.g.*, Webster Decl. Ex. 12.)

## ARGUMENT

## I.   Rule 26's liberal discovery standard

Under Rule 26, a party may obtain discovery regarding any nonprivileged matter that is relevant and proportional. Once the party seeking the discovery "has made a

threshold showing of relevance, the burden shifts to the party resisting discovery to show specific facts demonstrating that the discovery is not relevant, or how it is overly broad, burdensome, or oppressive." *In re: RFC and ResCap Liquidating Trust Litigation,* No. 13-CV-3451 (SRN/JJK/HB), 2015 WL 12778780, at *3 (D. Minn. June 8, 2015). The discovery rules are given broad, liberal interpretation. *Edgar v. Finley,* 312 F.2d 533, 535 (8th Cir. 1963). Relevancy in the discovery context is extremely broad, and a court must consider a discovery request relevant unless the information sought has no bearing upon the subject matter. *Mead Corp. v. Riverwood Natural Res. Corp.,* 145 F.R.D. 512, 522 (D. Minn. 1992).

## II. Specific objections required; general allegations of undue burden are insufficient

The party opposing discovery bears the burden of showing that the discovery request is overly broad and burdensome by alleging facts demonstrating the extent and nature of the burden imposed by preparation of a proper response. *Mead Corp.,* 145 F.R.D. at 515-16; *see also Wagner v. Dryvit Systems, Inc.,* 208 F.R.D. 606, 610 (D. Neb. 2001).

In raising an objection to an interrogatory, the objecting party has the burden to demonstrate "that the information sought is not reasonably available to it." *Lindholm,* 2016 WL 452315, at *5. When answering interrogatories, a party has an obligation to make efforts to obtain the desired information. *See id.* "If the answering party lacks necessary information to make a full, fair and specific answer to an interrogatory, it should so state under oath and should set forth in detail the efforts made to obtain the information." *Id.*

A general assertion of undue burden is not sufficient to resist producing requested documents. *See Continental Ill. Nat'l Bank & Trust Co. of Chicago v. Caton,* 136 F.R.D. 682, 684-85 (D. Kan. 1991). "A party claiming undue burden . . . ordinarily has far better information—perhaps the only information—with respect to that part of the determination." Fed. R. Civ. P. 26, advisory committee's note to 2015 amendment. A party opposing discovery of electronically stored information "must show that the information is not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B).

## III.    Proportionality

Shutterstock's exposure in this action is significant. This action currently involves 112 timely registered photographs. (Complaint Ex. A.) The law provides minimum statutory damages of $750 per work infringed and a maximum of $150,000 per work infringed if willfulness is shown. 17 U.S.C. § 504(c)(1)–(2). In addition to infringement damages, a plaintiff is entitled to $2,500 to $25,000 per copyright management information ("CMI") violation of 17 U.S.C. § 1202. *See* 17 U.S.C. § 1203(c)(3). For 112 works, with just one infringer and even a single CMI violation per work, the damages range in this case is between $364,000 and $19,600,000. But there are more than one downstream infringers, and there conservatively at least 300 distributions, though discovery may reveal the actual number to be thousands or tens of thousands.

Plaintiffs embedded CMI including copyright notices in the metadata of each of the Photographs (Webster Decl. Ex. 8), and Shutterstock has removed copyright notices and replaced them with their own copyright notices (ECF 33-3, p. 4) in addition to adding their logo watermark over Plaintiffs' Photographs, which is falsified CMI (Complaint ¶ 2).

Shutterstock distributed these images with falsified CMI to others. Each distribution of falsified CMI is a separate CMI violation.[19] This increases the minimum damages in this case to at least $1.1 million.

Shutterstock's willfulness is clear. They told the Court that "in September 2020, Shutterstock promptly disabled the identified images from search and licensing." (ECF 43, p. 6.) The truth is *much* worse, but even adopting Shutterstock's story, it seems difficult to imagine an outcome other than a finding of willful infringement when Shutterstock's general counsel and assistant general counsel opened and read a cease-and-desist letter in March 2020 (Flaherty Decl. Ex. 5), and then—in their own words—kept copying Plaintiffs' photographs for searching and licensing until at least September 2020. (ECF 43, p. 6.)

With this record providing strong evidence of willfulness, this is not a case of minimums. Infringement is willful if a defendant has recklessly disregarded a copyright, or if a defendant knew or should have known it infringed a copyrighted work. *RCA/Ariola Intern., Inc. v. Thomas & Grayston Co.*, 845 F. 2d 773, 779 (8th Cir. 1988). "[A] party may act recklessly by refusing, as a matter of policy, to even investigate or attempt to determine whether particular [works] are subject to copyright protections." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 992 (9th Cir. 2017). Knowledge that a use is infringing "may be inferred from the defendant's conduct." *N.A.S. Imp., Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992).

---

[19] *E.g.*, In *Preston Wood & Associates, LLC v. RZ Enterprises USA, Inc.*, a judgment awarded CMI violation statutory minimums of $2,500 *per distribution*, totaling $28.7 million for 11 copyrighted works. No. 16-cv-1427, ECF 188 pp. 4-5 (S.D. Tex. Nov. 8, 2018).

Any analysis of proportionality or burden in this action must involve a sober account of the possible damages at stake. Statutory damages are designed to deter, not simply compensate. *Capitol Records*, 692 F. 3d at 908 ("Congress no doubt was aware of the serious problem posed by online copyright infringement, and the 'numberless opportunities for committing the offense,' when it last revisited the Copyright Act in 1999. To provide a deterrent against such infringement, Congress amended § 504(c) to increase the minimum per-work award from $500 to $750, the maximum per-work award from $20,000 to $30,000, and the maximum per-work award for willful infringement from $100,000 to $150,000.").

In one case in this district involving infringement of 24 copyrighted songs, a jury awarded statutory damages of $9,250 per work. *Capitol Records, Inc. v. Thomas-Rasset*, 692 F. 3d 899 (8th Cir. 2012). Applying $9,250 per work to the 112 works Shutterstock has infringed here, to say nothing of CMI damages, would result in an award exceeding $1 million against Shutterstock. As a sophisticated, commercial IP licensor, Shutterstock is obviously more culpable than the noncommercial *Capitol Records* defendant, a mother of four from Brainerd.

## IV.  The discovery requests at issue

Plaintiffs served discovery requests on Shutterstock on May 12, 2021, making them originally due on June 11, 2021. (ECF 33-8.) Shutterstock requested a two-week extension, and on June 25, 2021, Shutterstock served their discovery responses. (ECF 33-1 to 33-3.) On June 30, 2021, Plaintiffs served a deficiency letter on Shutterstock (ECF 36-3), and followed up with additional concerns on July 2, 2021 (ECF 36-4). After Shutterstock

refused to meet and confer on a motion to compel, they finally did so after the pre-motion conference was set, and did so again on August 12, 2021. As of today, the discovery window of this case is now 46% over, and Shutterstock has produced just eight pages in response to Plaintiffs' requests for production served 103 days ago. (Flaherty Decl. Ex. 1.) Plaintiffs respectfully ask the Court to order Shutterstock's compliance with the following discovery requests as explained below.

| (1) | **Interrogatory No. 2:** | Identify all persons who were displayed, given access to, or who received any of the Photographs from you or anyone working in concert with you. If you do not know the identity of such persons, provide as much information as is known, for example IP addresses or visitor identifiers. |
| | **Shutterstock's Response:** | Defendant repeats and incorporates its General Objections as if fully set forth herein, and further objects to this Interrogatory because it is overbroad, vague as to "persons" and ambiguous as to the time period. Subject to and without waiver of the foregoing objections, Defendant states that it cannot respond to this Interrogatory because it does not have this information (including IP addresses or visitor identifiers) in its possession, custody, or control. |
| | **Deficiency Raised:** | June 30, 2021 letter (ECF 36-3), p. 5–6. |
| | **Order to compel should state:** | Fully answer interrogatory No. 2. |

Plaintiffs seek an order requiring Shutterstock to fully respond to Interrogatory No. 2. Shutterstock's current response is false, as Shutterstock now admits in the discovery dispute chart they have at least some information, which they now characterize as an incomplete subset.

First, Shutterstock admits selling and licensing Plaintiffs' photographs (ECF 43, p. 5), and distributing them to business partners like TinEye and ZCool/HelloRF (ECF 15 ¶ 14), but none are listed here. And, Plaintiffs' photographs appeared in Shutterstock advertising on the *Star Tribune* website (ECF 32-24) in what is an obvious distribution, but that's not identified here, either.

Plaintiffs have captured documentation showing that nearly every action on Shutterstock's website results in a substantial amount of data being collected by servers both at Shutterstock and at third-parties they've identified as their vendors. (ECF 32-26.) For example, clicking "preview" on image fires off an HTTP request to the hostname "api.proxy.analytics.shutterstock.com" with data values including: "eventAction: click, eventCategory: userInteraction, eventLabel: preview" along with a field "mediaId" which included a unique ID number Shutterstock assigned to the photograph, along with fields titled "sessionId," "visitId," and "visitorID" fields, the visitor's IP address, timestamp, and user ID. (Webster Decl. ¶ 30; ECF 32-26.) This happens whether a person is logged in or not. (*Id*.) Visiting the main page for a given photograph on Shutterstock's website—which Shutterstock calls the "Asset Detail Page"—sends tracking data to many third-parties, including Google Analytics. Specifically, timestamp, URL (including unique photo ID number), IP address, and unique identifier data is sent to Google Analytics. (ECF 32-26.)

Specifically, Plaintiffs can show visiting a Shutterstock URL with a unique ID Shutterstock assigned to Plaintiffs' Photographs fires an action that sends that data to

Google Analytics, (*Id*.) and that Google Analytics allows viewing and exporting reports of this data.[20]

At the recent meet-and-confer, Shutterstock's counsel stated she does not know whether Shutterstock uses Google Analytics. (Flaherty Decl. ¶ 7.) They do. Shutterstock's counsel should know this, given that the March 2020 and September 2020 letters demanded preservation of logs and analytics data (ECF 32-2, p. 4 and ECF 32-7, p. 4), a February 26, 2021 email to Shutterstock's counsel repeated that demand (ECF 33-3), the parties specifically agreed to a production format for analytics data (ECF 18, p. 9), Shutterstock publicly states that "Google provides … analytics software" for them (ECF 32-23), Plaintiffs' June 30, 2021 deficiency letter specifically stated Shutterstock uses Google Analytics and pointed out how many of their employees work in the in analytics (ECF 36-3), and Mr. Webster's July 12, 2021 declaration again explained that Shutterstock uses Google Analytics and included a screenshot demonstrating it. (ECF 32-26.) Shutterstock also discloses they "collect information as you browse, such as … pages viewed, information accessed, the Internet Protocol (IP) address used … These technologies are used in … tracking users' movements around the site". (ECF 32-16.)

---

[20] Because Google Analytics data references unique ID numbers Shutterstock assigned to the Photographs in suit, documents reflecting this information are likely also responsive to Request for Production No. 1. But Shutterstock refused to comply with that request. (ECF 33-2.)

In the versions of Plaintiffs' Photographs which Shutterstock distributed, they added to the IPTC metadata[21] a link which went directly to the webpage on Shutterstock's website where Shutterstock offered that particular photograph for sale, *e.g.*:

| Licensor URL |
| --- |
| https://www.shutterstock.com/image-photo/1851646171?utm_source=iptc&utm_medium=googleimages&utm_campaign=image |

(Webster Decl. ¶ 10.) Notably, that URL contains Google Analytics 'campaign parameters',[22] which tells Shutterstock that someone arrived at the webpage from the URL in the metadata ("utm_source=iptc"). Shutterstock's under-oath claim that they don't have information regarding who they've given access or displayed Plaintiffs' photographs to is simply not credible when they've designed their systems to track this level of detail.

Shutterstock's counsel's claim that this data "is of minimal priority as a business matter" isn't a suggestion that they don't possess this information, nor does it establish burden. But it also contradicts her client's statements. Shutterstock boasts to investors about having a "rich database" with "customer behavioral data," stating that "[w]e obtain a high volume of data generated from these user searches and content downloads," and that "[w]e have compiled a vast amount of data relating to the content in our collection".[23] Shutterstock uses that customer behavior data to generate insights on performance.[24] Shutterstock's investor report, https://content.shutterstock.com/investor-report/, includes

---

[21] The CMI involved in this case was contained in industry standard EXIF and IPTC metadata. *See* Complaint ¶¶ 32–42.

[22] "Collect campaign data with custom URLs," https://support.google.com/analytics/answer/1033863 (last visited Aug. 20, 2021).

[23] 2020 Annual Report and 10-K, *supra*.

[24] *Id.*; "The Art & Science of Visual Search," AI Business TV, https://www.youtube.com/watch?v=68bjbrsDbZc (last visited Aug. 19, 2021).

an animated map showing geographically where specific images were downloaded and when. (Webster Decl. Ex. 5.) When prioritizing their product development roadmap, Shutterstock uses "visitor level analytics" data. (Webster Decl. Ex. 21 at 12:00 (Tr. at Ex. 22 at p. 6).) The time period is not ambiguous, as Shutterstock knows the date it commenced infringement with respect to each of the Photographs.

Finally, this information is highly relevant to Plaintiffs' claims, as it is information regarding Shutterstock's torts: the identities of those who were displayed, given access to, or received Plaintiffs' copyrighted photos (ECF 1, pp. 62-65) and as a result, also those whom Shutterstock distributed CMI that Shutterstock altered, removed, or falsified. (ECF 1, pp. 63-64). In other words, this information could reveal how many times they distributed the works, when they distributed the works, when they ceased infringement, to whom they distributed the works, and so on. Other courts have held Google Analytics data is discoverable. *E.g.*, *Am. Broadcasting Cos. v. Aereo, Inc.*, No. CV-12-80300-RMW, 2013 WL 1508894, at *4 (N.D. Cal. Apr. 10, 2013) (denying motion to quash subpoena for Google Analytics data in copyright case); *Skyline Steel, LLC v. PilePro, LLC*, 101 F. Supp. 3d 394, 407 (S.D.N.Y. 2015) (noting that Google Analytics data is discoverable, but there Google Analytics was inadvertently disabled shortly before infringement commenced); *Grasshopper House, LLC v. Clean & Sober Media LLC*, 394 F. Supp. 3d 1073, 1088 (C.D. Cal. 2019) (identifying trial exhibits that used Google Analytics data).

Shutterstock's counsel was asked at the meet-and-confer to substantiate the claimed burden in time or dollars, and she said her client's response was: "ugh, you know, this is

going to be so much work." (Flaherty Decl. ¶ 8.) That's not sufficient. Shutterstock should

be ordered to fully respond to this interrogatory.[25]

---

| | | |
|---|---|---|
| **(2)** | **Request for Production No. 2:** | Produce all copies or versions of the Photographs, including without limitation any original uploads, resized versions, thumbnails, final versions, website versions, downloadable versions, distributed versions, or similar. |
| | **Shutterstock's Response:** | Defendant repeats and incorporates its General Objections as if fully set forth herein, and further objects to this Request because it is overbroad, vague and ambiguous, and unduly burdensome. Subject to and without waiver of the foregoing objections, Defendant states that residual thumbnails (small, low-resolution versions of images for demonstration purposes) are normally available for reference in Defendant's internal system, but were removed after Plaintiffs' insistence that all images be removed from accessibility via any means, including accessible via reverse-image search, so they cannot be produced. Defendant further objects that it is unduly burdensome to produce the original images which are stored in Defendant's deep servers. |
| | **Deficiency Raised:** | June 30, 2021 letter (ECF 36-3), p. 18–21 |
| | **Order to compel should state:** | Produce responsive documents, including specifically all original images. |

---

Plaintiffs request the Court order Shutterstock to fully comply with this request for

production, including by producing every version of the Photographs in Shutterstock's

---

[25] Interrogatory 2 seeks only an answer to its question, not necessarily all raw analytics data itself (which is responsive to Request for Production No. 1, which Shutterstock refuses to respond to). Shutterstock could, however, include in its answer to Interrogatory 2 an identification of that data pursuant to Fed. R. Civ. P. 33(d).

possession, custody, or control—especially the original photographs. This is the most important discovery request relating to Plaintiffs' CMI claims.

When Plaintiffs originally created the Photographs in suit, they added industry-standard EXIF and IPTC metadata including titles, descriptions, and keywords, along with CMI including contact information and copyright notices. (ECF 1 ¶¶ 28–45.) For example, when Mr. Webster published one of the Photographs in suit, he added, among other things, the following metadata:

| Description | A golden eagle watches over Allouez Bay of Lake Superior at Wisconsin Point, Superior, Wisconsin. |
|---|---|
| Artist | Tony Webster |
| Copyright Notice | © 2019 Tony Webster |
| Source | Copyright (c) 2019 Tony Webster |
| Web Statement | https://tonywebster.com/ |
| Instructions | Copyright © 2019 Tony Webster. All rights reserved. (Contact: +1 (202) 930-9200, tony@tonywebster.com, www.tonywebster.com) |
| Usage Terms | Copyright (c) 2019 Tony Webster. All rights reserved. |

(Webster Decl. Ex. 8.)

This metadata constitutes "standard technical measures" under 17 U.S.C. § 512(i)(2). *See Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 615 (9th Cir. 2018) ("One can imagine a digital version of the old c in a circle (©) automatically triggering the uploading software to exclude material so marked by the copyright owner."). Shutterstock loses its safe harbor if it "interfere[d] with standard technical measures." 17 U.S.C. § 512(i)(1)(B); *Gardner v. CafePress Inc.*, 2014 WL 794216, at *6 (S.D. Cal. Feb. 26, 2014).

Most professional digital cameras write artist and copyright information to the raw file at the time of capture and most photography editing software reads and writes this same

data. (Webster Decl. ¶ 6.) According to an industry survey, 95% of photographers and 84% of photo suppliers said "documentation of rights" was a medium or high-relevance business purpose for using the specific fields of CMI metadata at issue in this case. (Webster Decl. Ex. 10.) And Shutterstock themselves specifically cited licensing, copyright, ownership, and credit line information as something that photograph metadata provides. (Webster Decl. Ex. 11.)

As Shutterstock's top in-house intellectual property lawyer described, a "way to protect your images is to add your copyright information to the metadata. While unauthorized users of your images could scrub this information out of the metadata, many might not. If you regularly license your images, this can help you cross-reference and confirm any misuse of your images." (Webster Decl. Ex. 18.)

Plaintiffs can show Shutterstock placed their own CMI – including in the very same metadata fields – into versions of the Photographs in suit:

| Copyright Notice | Copyright (c) 2020 Shutterstock.  No use without permission. |
|---|---|
| Source | Shutterstock |
| Web Statement | https://www.shutterstock.com/license?utm_source=iptc &utm_medium=googleimages&utm_campaign=webstatement |

(Webster Decl. ¶ 10.)

Plaintiffs can also show that Shutterstock ingested and extracted some of the metadata which Plaintiffs added to the original Photographs, because the image descriptions on Shutterstock's website are exactly as Plaintiffs wrote them and embedded them within their image files:



(Compl. Ex. C (the text "A golden eagle watches…" was written by Plaintiffs, and Shutterstock obtained it from the EXIF/IPTC metadata, which also contained copyright notices).)

Shutterstock does not dispute the showing that Shutterstock has possession of and used Plaintiffs' metadata that was embedded within the original Photographs, but the question is whether Shutterstock ever possessed Plaintiffs' copyright notices or other CMI.

Shutterstock admits possessing the original native file they obtained from the Shutterstock Contributors at issue, but they are refusing to produce it. Shutterstock is alleging those files are stored in Shutterstock's "deep servers" and that it would be "unduly burdensome to produce." Plaintiffs believe the claim of purported burden may be

pretextual, as if those files do contain, *e.g.*, "Copyright (c) 2019 Tony Webster," and Shutterstock when making copies deleted that data and overwrote it with "Copyright (c) 2019 Shutterstock," it would be evidence: (1) showing both actual knowledge and non-accommodation and interference with standard technical measures, foreclosing on a DMCA safe harbor defense; (2) showing willful copyright infringement; and (3) showing removal and falsification of CMI by Shutterstock.

Forced to infer what "deep servers" means, Plaintiffs have evidence that Shutterstock stored variants of the Photographs on Amazon Web Services' ("AWS") Simple Storage Service ("S3"), (Webster Decl. Ex. 13), and believe Shutterstock might be referring to an S3 storage class[26] called "S3 Glacier" or "S3 Glacier Deep Archive." (A thorough explanation is at ECF 36-3, pp. 18–21.) Plaintiffs asked Shutterstock to clarify, but 54 days later, they have not done so. (*Id*.) Whatever "deep servers" means, these types of storage solutions are for companies who do not wish to invest in hardware infrastructure but need to have long-term storage of files, usually for legal and compliance reasons. (*Id*.) In exchange for a reduced monthly storage rate, AWS charges more money when files are retrieved. (*Id*.) But, if "deep servers" does mean AWS's Glacier offerings, Plaintiffs calculated what the likely cost would be for Shutterstock to retrieve these files at AWS's advertised market rates, and the cost was less than two dollars. (*Id*.) 54 days have passed since Plaintiffs provided this calculation to Shutterstock, and they have not contested it or provided any alternative quantification of burden. If Shutterstock is storing responsive data

---

[26] Amazon S3 Storage Classes, https://aws.amazon.com/s3/storage-classes/ (last visited Aug. 19, 2021).

in an AWS S3 Glacier or Glacier Deep Archive storage class—or something similar, whatever "deep servers" means—Shutterstock elected to use the file storage systems they selected or designed, and thus Shutterstock cannot claim burden for their systems working as they intended.

Shutterstock wrote in the discovery dispute chart that "Shutterstock believes that providing the information about the metadata that was attached to the photographs, as opposed to providing the originals of the photographs, would be more straightforward and productive." First, "*information about* the metadata" is not *the metadata*, and sounds like a set-up for more gamesmanship. And even if it's not, Shutterstock's proposal would have them retrieving the files anyway—while still not providing the files to Plaintiffs—showing their argument of burden is feigned. But that much is already clear, as Shutterstock stated in their Answer (ECF 15, ¶ 4) that "Defendant denies that there was any copyright notice or other copyright management information ("CMI") present in the uploaded photographs that identified either Tony Webster or Itasca Images, LLC as the owner." If Shutterstock is contending it is burdensome to retrieve the very files that would have provided the factual basis for Shutterstock making this denial in their Answer, two options spring to mind: either Shutterstock didn't retrieve the files and made that statement without knowing the facts, or Shutterstock has retrieved the files, showing their burden argument was a fiction.

Shutterstock's comments in the discovery dispute chart are self-contradictory. Shutterstock simultaneously states that "Shutterstock never had any objection to producing this material in native form" (false) before in the very next sentence providing objections to producing it. Shutterstock made exceptionally clear in the first meet-and-confer on July

23, 2021 that they would not agree to produce the original photographs, and nothing has changed. Shutterstock's comments about visual watermarks are a distraction.

This request is plainly relevant to all of Plaintiffs' claims. The request seeks the very subject of this lawsuit: *the Photographs*. The Photographs Plaintiffs created and copyrighted; and the Photographs Shutterstock infringed. Each copy of a Photograph is a violation of Plaintiffs' rights. 17 U.S.C. § 106(1). Copies from which Shutterstock accessed or stripped Plaintiffs' metadata are relevant, as are copies made prior to Shutterstock's stripping of Plaintiffs' metadata. So too are copies that Shutterstock distributed with false CMI in violation of 17 U.S.C. § 1202(a)-(b). (ECF 1, pp. 63-64.) Shutterstock should be ordered to produce documents responsive to this request, including the original photographs with all metadata intact.

| (3) | **Request for Production No. 17:** | Produce all Contracts between Shutterstock and Idée Inc., d/b/a TinEye. |
|---|---|---|
| | **Shutterstock's Response:** | Defendant repeats and incorporates its General Objections as if fully set forth herein, and further objects to this Request because it is vague and ambiguous as to the time period, unduly burdensome, and seeks confidential information. Subject to and without waiver of the foregoing objections, Defendant requests that Plaintiffs explain the relevance of this Request before responding. |
| | **Deficiency Raised:** | June 30, 2021 letter (ECF 36-3), p. 29-30 |
| | **Order to compel should state:** | Produce responsive contracts. |

Plaintiffs seek an order requiring Shutterstock to comply with Request for Production No. 17 and produce contractual agreements between Shutterstock and Idée Inc., d/b/a TinEye ("TinEye"). TinEye is an image search website, but unlike their natural search results that show where given image can be found online, Shutterstock has a business relationship with TinEye which results in Shutterstock taking over the search results for a particular image—nearly all the infringed Photographs in suit—to display a sponsored advertisement *above search results* with a link to Shutterstock's website, where they illegally sold the photograph:



This arrangement suffocates Plaintiffs' internet presence for an important pathway to these photographs: clicking on these TinEye advertisements brings a person to Shutterstock's website, thus continuing to take attention away from Plaintiffs and diverting it to Shutterstock *for the very photographs in suit. See*, *e.g.*, Webster Decl. Ex. 9, which shows Shutterstock is sponsoring an advertisement showing one of Plaintiffs' Photographs, Shutterstock-assigned photo ID number 1356488870, which leads to Shutterstock's website *as of the past week*. Shutterstock ID number 1356488870 was noticed in the March 2020 cease-and-desist letter (ECF 32-4, p. 13, row 99) and the September 2020 cease-and-desist letter (ECF 32-8, p. 5, row 10), both of which Shutterstock's general counsel and

DMCA designated agent opened and read on March 9, 2020 and September 22, 2020, respectively (Flaherty Decl. Exs. 5, 9), and is identified in the Complaint, Ex. A, p. 3.

Shutterstock's demand for the relevance to be explained to them is feigned. The Complaint, under the heading "Shutterstock entered into a partnership with TinEye to direct searches for Plaintiffs' Photographs directly to Shutterstock" clearly establishes relevance. (Complaint ¶ 274–285.) Shutterstock *admitted* in their Answer, at ¶ 14, that "TinEye is a Shutterstock affiliate" and that "TinEye has access to Defendant's API to run its reverse image technology on Defendant's platform." Shutterstock has admittedly distributed Plaintiffs' images to TinEye via Shutterstock's API, and now seeks to hide the agreement(s) under which Shutterstock made that very distribution, and under which Shutterstock runs these attention-stealing advertisements.

Plaintiffs have documented that nearly all the photographs in suit are displayed on the TinEye website with Shutterstock's logo. This is therefore clearly copying and distribution, and Plaintiffs are entitled to review the contractual agreement between the companies. This request is relevant because it involves contractual agreement(s) which facilitated distribution and Plaintiffs own the right to copy, make derivative works, and distribute the Photographs. *See* 17 U.S.C. § 106(1)-(3).

Shutterstock's offer in the discovery chart to produce what it calls its "standard" agreement—while admitting their agreement with TinEye was "specially-negotiated"—is obviously not sufficient. Shutterstock has failed to substantiate any burden. Shutterstock should be ordered to produce documents responsive to this request.

| | | |
|---|---|---|
| **(4)** | **Request for Production No. 18:** | Produce all Contracts between Shutterstock and ZCool d/b/a HelloRF. |
| | **Response:** | Defendant repeats and incorporates its General Objections as if fully set forth herein, and further objects to this Request because it is overbroad, vague and ambiguous as to the time period, unduly burdensome, and seeks confidential information that bears no demonstrated relationship to the claims in this action and thus is a fishing expedition. Accordingly, Shutterstock will not produce documents in response to this Request. |
| | **Deficiency Raised:** | June 30, 2021 letter (ECF 36-3), p. 30-31. |
| | **Order to compel should state:** | Produce responsive contracts. |

Shutterstock's contention that their contracts with ZCool/HelloRF "bears no demonstrated relationship to the claims in this action and thus is a fishing expedition" is incredible. Shutterstock distributed many of Plaintiffs' Photographs to ZCool/HelloRF, and ZCool/HelloRF copied and displayed those photographs with Shutterstock's logo watermark on top of them, and ZCool/HelloRF offered them for resale on their website. (Complaint ¶¶ 326–339.) ZCool/HelloRF uses photo ID numbers, and those numbers are an exact match to Shutterstock's ID numbers. (Compl Ex. F.) In fact, Plaintiffs' photographs—which Shutterstock stamped with their logo—were still being offered for sale by HelloRF as of this month. (*E.g.*, Webster Decl. Ex. 12.)

Shutterstock's answer states "Defendant has certain business relationships with … ZCool." (Answer ¶ 14.) Shutterstock wrote in the discovery chart that "Shutterstock did

not 'send' the photographs to ZCool any more than they did with respect to any other reseller.  Shutterstock does not believe that any contract that Shutterstock has with resellers is relevant." This is illogical: Shutterstock admits HelloRF is a reseller and implicitly admits they sent the photographs to resellers. That is distribution in violation of Plaintiffs' exclusive rights. JPG image files of Plaintiffs' Photographs—stamped with Shutterstock's logo on top—are being served from HelloRF's server *as of this week*. (Webster Decl. Ex. 31.) This scheme is described in the Complaint under the heading "Shutterstock provided the Photographs to a company in China who offered them for as little as 29 cents each." (Compl. ¶¶ 326–339, 425, 475.)

Filed with this motion is a declaration from another victim, in that case a legitimate Shutterstock Contributor who ended their relationship with Shutterstock, but Shutterstock continued to wrongly distribute their photographs through HelloRF over year later. (Lowe Decl. ¶ 13–16, Exs. 6–7.)

The contract facilitating this distribution is obviously relevant, including for the same reasons as the TinEye contracts discussed above. Shutterstock should be ordered to produce it.

| (5) | **Request for Production No. 22:** | Produce all Documents regarding Assets continuing to be displayed after a Shutterstock Contributor's account is terminated, including without limitation any change requests, bug reports, issue tickets, technical communications, and commit messages. |
| | **and No. 23:** | Produce all Documents regarding change requests, bug or defect reports, improvements, or fixes to the Shutterstock Website relating to Assets |

continuing to be displayed after a Shutterstock Contributor's account is terminated.

| | |
|---|---|
| **Shutterstock's Response to No. 22:** | Defendant repeats and incorporates its General Objections as if fully set forth herein, and further objects to this Request because it is overbroad and unduly burdensome. Subject to and without waiver of the foregoing objections, Defendant will provide responsive documents beyond what was already produced, if any, regarding Assets that continued to be displayed following termination of the specific accounts corresponding to the claimed Photographs in the case. |
| **and No. 23:** | Defendant repeats and incorporates its General Objections as if fully set forth herein, and further objects to this Request because it is overbroad and unduly burdensome. Subject to and without waiver of the foregoing objections, Defendant will provide responsive documents, if any, regarding change requests, bug or defect reports, improvements, or fixes to the Shutterstock Website relating to the Photographs. |
| **Deficiencies Raised:** | June 30, 2021 letter (ECF 36-3), p. 34–35. |
| **Order to compel should state:** | Produce responsive documents without limitations specific to or relating to, the Photographs in suit. This includes documents relevant to Shutterstock's "█████████" excuse, even if the purported "█████████" is not specific to the Photographs in suit. |

These two, related document requests seek information regarding Shutterstock's safe harbor affirmative defense, and willfulness. Shutterstock has put forth ever-shifting justifications for why they continued to copy and display Plaintiffs' photographs after March 2020. At first, Shutterstock's counsel vehemently denied Shutterstock's receipt of the March 2020 Letter: "In March 2020 … Shutterstock was never made aware of the

infringing images online." (ECF 36-5.) Shutterstock stated in court filings that "Defendant did not receive such letters" (ECF 15, ¶ 6) and that "Shutterstock did not receive such letters or *any sort of notice regarding the images at issue at that time*" (emphasis added) (ECF No. 18, p. 3).

None of that was true. Shutterstock produced a copy of the March 2020 letter, perhaps unaware that it contained metadata indicating it was scanned within mere hours of delivery by USPS. (ECF 32 ¶ 8.) So Plaintiffs served a subpoena on Shutterstock's registered agent Corporation Service Company ("CSC") for evidence of when Shutterstock opened the March 2020 Letters. (Flaherty Decl. Ex. 3.)

CSC on produced a log showing Shutterstock's now-former general counsel Heidi Garfield and Shutterstock's DMCA designated agent and now-former top in-house IP lawyer Sejal Patel (who signed Shutterstock's interrogatories) both opened and read the March 2020 Letter on March 9, 2020:[27]

| User Name | Action | Date/Time |
|---|---|---|
| Heidi Garfield | Document marked as read | 03/09/2020 02:54 PM EDT |
| Heidi Garfield | Viewed document | 03/09/2020 02:54 PM EDT |
| Sejal Patel | Document marked as read | 03/09/2020 02:47 PM EDT |
| Sejal Patel | Viewed document | 03/09/2020 02:47 PM EDT |
| Sejal Patel | Acknowledged transmittal | 03/09/2020 02:47 PM EDT |

(Flaherty Decl. Ex. 5.)

Shutterstock continued to display and offer for sale all of those 111 photographs noticed in the March 2020 Letter on their website. (ECF 32-5 (showing an example of one of these images online in September 2020).) If Shutterstock was entitled to the DMCA safe

---

[27] Shutterstock did not identify Ms. Garfield in their Initial Disclosures.

harbor, they lose it if they have either actual knowledge of infringement, or have awareness of facts or circumstances from which infringing activity is apparent—called red flag knowledge. 17 U.S.C. § 512(c)(1)(A). And § 512(c)(1)(C) further provides that Shutterstock would also lose the safe harbor if they failed to expeditiously remove or disable access to the infringed works. Under § 512(c)(1)(A), a service provider can receive safe harbor protection only if it: (1) lacks actual knowledge of infringement; (2) in the absence of such actual knowledge, lacks knowledge of facts and circumstances from which infringing activity is apparent; or (3) upon obtaining such knowledge or awareness, expeditiously removes or disables access to the material.

But it gets worse. This lawsuit was docketed on February 2, 2021 at approximately 2:13 p.m. Central Time. Within three hours—and before Shutterstock was even served— Attorney Patel opened the March 2020 letter *again* using a link in an email she received in March 2020, and then came back to it on March 1, 2021 as well:

| User Name | Action | Date/Time |
|---|---|---|
| Sejal Patel | Viewed document | 03/01/2021 07:24 PM EST |
| Sejal Patel | Viewed document | 03/01/2021 07:22 PM EST |
| Sejal Patel | Document marked as read | 02/02/2021 05:58 PM EST |
| Sejal Patel | Viewed document | 02/02/2021 05:58 PM EST |
| Sejal Patel | Acknowledged transmittal | 02/02/2021 05:58 PM EST |

(Flaherty Decl. Ex. 6.)

Just 48 hours after Shutterstock's in-house counsel "viewed" the March 2020 letter again, Shutterstock's outside counsel put into writing: "Shutterstock did not see that letter." (ECF 36–3.) Shutterstock then made offensive accusations that Plaintiffs "sent a DMCA notice to the wrong place so that it could assert a 'gotcha' claim against Shutterstock (which

is not obligated to comply with improper notices, much less *ones it did not receive*)" (emphasis added). To be clear, there were not different March 2020 letters; there was a single March 2020 letter sent via multiple means. (ECF 32–1 to 32–4.)

Shutterstock carried on with this dishonesty for *months*. In Shutterstock's portion of the Rule 26(f) report, Shutterstock wrote "Shutterstock did not receive such letters or *any sort of notice regarding the images at issue at that time* [March 2020]." (ECF 18 p. 3 (emphasis added).) Shutterstock needlessly forced Plaintiffs to burn discovery requests, stating in response to one of them on June 25, 2021: "Corporation Service Company … sent a notice via email in March 2020, but [Shutterstock] avers that it was *not received at that time by Defendant. This was due in part to the email message being *sent to Shutterstock's spam folder*…" (ECF 33-3, p. 6 (emphasis added).)

Attorney Patel's employment relationship with Shutterstock suddenly recently ended, just weeks after she signed Shutterstock's interrogatory responses under penalty of perjury. But at no time has Shutterstock come clean about their false statements to the tribunal or Plaintiffs' counsel. Rather, Plaintiffs discovered the ruse when CSC complied with the subpoena on August 13, 2021.

Shutterstock cannot credibly claim that in September 2020—six months after Plaintiffs' first round of letters which Shutterstock can no longer dispute receipt of—and ███ months after Shutterstock terminated the Shutterstock Contributors they sourced those 111 Photographs from ████████████—that they lacked either red flag or actual knowledge, nor that they expeditiously removed the material after receipt of Plaintiffs' letters.

As Shutterstock's DMCA safe harbor defense has fallen apart, Shutterstock has shifted to a brand-new defense, which they have designated confidential: ███

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████" (ECF 36.)

There's evidence that 111 of 112 Photographs in suit remained displayed and offered for sale and distribution at least ██ months after Shutterstock says they terminated the Shutterstock Contributor they sourced those Photographs from; and that for at least some of the Photographs, that continued to May 2021, some ██ months after Shutterstock terminated the Contributor. (Webster Decl. Ex 32 (showing Shutterstock offering to sell Plaintiffs' photographs Shutterstock sourced from Contributor Perfect Photo in May 2021).)

Shutterstock is attempting to explain away a two-year period of time in which they continued to display and offer to sell images they knew had been infringed as being a "████████" with their website or systems. Shutterstock does not contend that the "████████" is limited to the particular Photographs in suit, but Shutterstock improperly seeks to limit its compliance with this document request to the Photographs in suit.

To be clear: Plaintiffs agree there's a widespread problem on Shutterstock's website which results in images that should have been taken down continuing to be displayed, distributed, and offered for sale—be it for copyright infringement reasons, or because a legitimate Shutterstock Contributor wanted to stop doing business with Shutterstock. The problem seemed to go away in late May or early June of this year, after Plaintiffs notified

Shutterstock they found some of the same Photographs in suit and even more photographs beyond that still displayed and offered for sale on Shutterstock's website, and all sourced from the same Shutterstock Contributors they terminated in 2019. (Webster Decl. ¶ 29 and Ex. 32.) But this issue is not just limited to these Photographs or these Shutterstock Contributors. Shutterstock's counsel agreed with that at the August 12, 2021 meet-and-confer. In May 2020, Shutterstock reduced the cut of sales they pay their Contributors, and many left in frustration. (Lowe Decl. ¶ 2.) Filed with this motion is a declaration from one such former Shutterstock Contributor, who describes terminating his relationship with Shutterstock in May 2020, only to find his images still online at a Shutterstock distributor in December 2020. (*Id.* ¶ 4–8 and Exs. 2–8.) He tried to log in to Shutterstock's website, but as expected, it said his account was terminated. (*Id*.) Nevertheless, Shutterstock was still displaying and offering to sell his photographs in May 2021, and his photographs were as of the past week still being offered for sale at Shutterstock distributor HelloRF. (*Id.* ¶ 10–16.) And Plaintiffs observed that simply browsing the Shutterstock website as a customer resulted in running into images being displayed and offered for sale that seemed to be missing Shutterstock Contributor information in May 2021. (Webster Decl. ¶ 29.)

It remains to be proven whether this problem was a mistake, or the knowing design of Shutterstock's systems. In the words of Shutterstock's counsel, it's the "big mystery." But it need not be. Discovery into when Shutterstock discovered this issue and Shutterstock's work or lack of work into fixing this purported "████████" are highly relevant: they are claiming it's the reason for their continued display of the Photographs in

suit. The civil rules do not allow Shutterstock to put forth a defense and withhold documents that would undercut that defense.

Multiple Shutterstock employees have stated that Shutterstock uses the issue-and-project tracking software Jira, and the case-management software Salesforce. (Webster Decl. Ex. 15.) Shutterstock's Contributor Care Team Lead "Create[s] and monitor[s] Bug Index by collecting bug info from reported cases, logging bug reports in JIRA, and following through with appropriate tech teams on resolving and/or prioritizing" and "[m]anage[s] escalated cases via SalesForce regarding Account Maintenance, Bugs/Tech Issues, Compliance/Legal, Fraud, Earnings/Payments, Portfolio, Review, and Upload/Submit." (*Id.*, p. 1) Another employee "[m]anaged and maintained a JIRA board/tasks, coordinated with other team leads to distribute and prioritize work," (*Id.*, p. 6), and yet another employee "[u]sed Jira bug management system for managing bugs" and declared that the "Xray Test Management tool [] can be widely used across teams in the organization." (*Id.*, p. 10). Shutterstock's Product Marketing Manager of Platform Solutions said of her typical day at Shutterstock: "I have to stay on top of all the ongoing launches and projects. So I use Jira. There's ticket management, project management, prioritization, that might happen on a day to day basis." (Webster Decl. Ex. 21 at 19:38 (Tr. at Ex. 22, p. 9).)

By default, Jira contains fields to define the summary of a bug or issue report, a "detailed description of the issue," the priority level set on software developers resolving it, the component tasks and sub-tasks necessary to resolve the issue, the timestamp of when the issue was created, notes and comments added by project managers or software

developers, and can track the amount of time spent on resolving the issue. (Webster Decl. Ex. 14.) Xray Test Management allows developers to "identify bugs sooner and reduce the costs of finding them at a later stage" so "you'll never deliver broken or untested code again".[28]

Any Jira ticket or similar documentation showing that Shutterstock knew about this purported "███████" in, *e.g.*, 2019 or 2020 but did nothing to fix it until May 2021—three months after this lawsuit was filed and 14 months after Plaintiffs' cease-and-desist letter—is directly relevant to red-flag knowledge and willfulness. If Shutterstock is going to attempt to explain away its conduct as mistake, Plaintiffs deserve the opportunity show when they knew, who knew, what they did to fix or not fix it, or that it wasn't actually a mistake.

Shutterstock's response should not be limited to the Photographs in suit because the programming and behavior of Shutterstock's website is not limited to the Photographs in suit. Plaintiffs have documented that Shutterstock continued displaying at least thousands of images associated with apparently terminated Shutterstock Contributors, including images not belonging to Plaintiffs and including Contributors with no involvement with Plaintiffs' Photographs. (Webster Decl. ¶ 29; Lowe Decl.) Whatever purported change Shutterstock made in May–June 2021 was not applied solely to Plaintiffs' Photographs,

---

[28] "Xray Test Management App – Quick demo," https://www.youtube.com/watch?v=uKZng5ZmtJM (last visited Aug. 20, 2021).

but rather Shutterstock's website generally. These requests are relevant to Shutterstock's

new "███████████" defense, knowledge, and willfulness.[29]

Shutterstock should be ordered to produce documents responsive to these requests

without limiting that production to the Photographs in suit.

| | | |
|---|---|---|
| **(6)** | **Request for Production No. 24:** | Produce all Documents regarding any criteria considered by Shutterstock when approving any Asset. |
| | **Shutterstock's Response:** | Defendant repeats and incorporates its General Objections as if fully set forth herein, and further objects to this Request because it is overbroad. Subject to and without waiver of the foregoing objections, Defendant will produce documents arguably related to intellectual property aspects of any review that may have been applied to assets such as the Photographs at issue in this lawsuit. |
| | **Deficiency Raised:** | July 2, 2021 email (ECF 36-4). |
| | **Order to compel should state:** | Produce responsive documents without limitation to intellectual property review. |

As discussed *supra*, Shutterstock reviews the images they source from Shutterstock

Contributors, and only images which meet their criteria are accepted. Shutterstock seeks to

limit their production solely to "intellectual property aspects," likely because they know

the full extent of their curatorial review will establish that the infringement was not "by

---

[29] Shutterstock's comments in the discovery dispute chart about "low-resolution thumbnails" being "not actionable" is a distraction. This motion is not the appropriate place for Shutterstock to ask for a holding that an infringer's resizing of images immunizes them from liability, nor that when an infringer places their corporate logo on images they copied, it immunizes them from suit. In any event, the images Shutterstock copied, displayed, and distributed were big enough to fill a 65-inch TV. (Webster Decl. Ex. 25.) No one's thumb is 65 inches across.

reason of the storage at the direction of a user," 17 U.S.C. § 512(c)(1), and that Shutterstock "has the right and ability to control such activity," § 512(c)(1)(B).

Shutterstock's proposal to produce only IP review-related documents is improper. The non-IP review documents show that Shutterstock lacks the DMCA Safe Harbor. Shutterstock's proposal to produce only IP review-related documents allows it to produce only documents helpful for its purported defense, *see* 17 U.S.C. § 512(m),[30] while withholding similar documents—the non-IP review ones—that harm its purported defense. *See Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F. 3d 1045, 1056-57 (9th Cir. 2017) (where moderators manually review reviewed user-submitted photographs for substance, safe-harbor may be precluded); *UMG Recordings*, 718 F.3d at 1020; *accord Capitol Records, LLC v. Vimeo, LLC*, 972 F. Supp. 2d 537, 518-19 (S.D.N.Y. 2013) (posting of others' materials by defendants' own employees precluded summary judgment grant of safe harbor). Where a service provider acts as an active gatekeeper or curator, that defendant does not add material "initiated entirely at the volition of [its] users," and is not entitled to the safe harbor. *UMG Recordings v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1021 (9th Cir. 2013). Information is relevant even if bad for Shutterstock.

Shutterstock tells their investors, "we review the value and integrity of all content with proprietary AI technology and expert human mediation," (Webster Decl. Ex. 27 at 00:16 (Tr. at Ex. 28)), and says their curatorial review involves "customer satisfaction as a

---

[30] The DMCA provides that no liability will arise from "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m).

principal theme"[31] as images are "vetted through [Shutterstock's] proprietary technology and by a specialized team of reviewers to ensure that it meets [their] standards of quality and licensability".[32]

A company like Shutterstock—who curates its commercial stock photography collection on a photograph-by-photograph basis, measuring every individual submission against its own bespoke rules—is exercising its own discretion, not acting at the direction of its users. As Shutterstock described its role: "[W]e are the primary obligor in the arrangement, have control in establishing the product's price, perform a detailed review of the digital imagery before accepting it into our collection to ensure it is of high quality before it may be purchased by our customers, can reject contributor's images in our sole discretion, and have credit risk".[33]

Shutterstock has said in this litigation that they are a "passive platform" (ECF 33-4) without the "obligation to police" (ECF 18, p. 3) or "monitor its service," (ECF 15, p. 8) and that Shutterstock is just an "intermediary" (ECF 33-1, p. 11) and "is a completely neutral party" (*Id.*). During the meet-and-confer process for this motion, Shutterstock's attorney said, "robots run this thing," (Flaherty Decl. ¶ 8), which contradicts Shutterstock's Content Review Manager, who said: "[N]o, we don't have any robots that are doing review. All review is being done by human beings. So human beings are looking at these images and they're making determinations on these images." (Webster Decl. Ex. 23 at 53:50 (Tr.

---

[31] "How is content reviewed?" https://support.submit.shutterstock.com/s/article/How-is-content-reviewed (last visited Aug. 20, 2021).
[32] 2020 Annual Report, *supra*.
[33] Shutterstock's 2015 SEC 10-K filing, https://investor.shutterstock.com/node/7026/html (last visited Aug. 19, 2021).

at Ex. 24 p. 20)). That statement also might be offensive to the Shutterstock Reviewers who every day "review approximately 2,000 images" in accordance with Shutterstock's "internal detailed content guidelines" and "stay[] up to date on Shutterstock's content standards." (Flaherty Decl. Ex. 2, Call Compl. ¶ 13.)

Shutterstock's reviewers are not just trained on technical or IP issues, but also whether to accept images based on subjective artistic standards (Webster Decl. Ex. 24, p. 9, Tr. at 23:29 ("Now, composition can be one of our more subjective rejection reasons. So when we instruct reviewers on using this rejection reason, we try to be as clear as possible for when they can use this.")) Plaintiffs have discovered a website titled "Content Review Guidelines," https://reviewerguidelines.shutterstock.com/, but it appears to require a Shutterstock employee account to login.

These requests are relevant because they contradict Shutterstock's claim to be a "passive platform," and the responsive documents would show both "the right and ability to control such activity" (17 U.S.C. § 512(c)(1)(B)) and that Shutterstock's infringement is not "at the direction of the user" (§ 512(c)(1)). Shutterstock has admitted to doing a "duplicate image review that usually identifies duplicative content" (ECF 33-3, p. 10), and stated they ███████████████████████████████████████████ ███████████████████████████████████ (ECF 36). That process can generate "red flag knowledge." Plaintiffs have discovered Shutterstock's review process involves a URLs like <https://review.shutterstock.com/queues/illustration#notes_duplicates>, which implies the review process includes taking "notes" regarding "duplicate[]" images. (Webster Decl. Ex. 6.)

These requests are further relevant because the instructions and standards were used by Shutterstock in deciding whether to engage in actions which violate Plaintiffs' exclusive rights (*e.g.*, copying, distribution). Shutterstock's "review process is designed to ensure that every image is appropriately licensed for its intended use"[34] so a process that wrongly determined Shutterstock could license Plaintiffs' photographs is clearly relevant. At the meet-and-confer, Shutterstock's counsel didn't quantify any purported burden. Shutterstock should be ordered to produce documents responsive to this request without limiting that production to the documents "related to intellectual property aspects of any review."

| (7) | **Request for Production No. 26:** | Produce all Documents regarding differences in the rate of fraud or copyright infringement associated with particular countries or geographic regions. |
|---|---|---|
| | **Shutterstock's Response:** | Defendant repeats and incorporates its General Objections as if fully set forth herein, and further objects to this Request because it is vague, overbroad, and unduly burdensome, including in that it calls for documents that are not in its possession, custody, or control. Subject to and without waiver of the foregoing objections, Defendant states that it has no documents responsive to this Request. |
| | **Deficiency Raised:** | July 2, 2021 email (ECF 36-4). |
| | **Order to compel should state:** | Produce responsive documents. |

---

[34] Shutterstock's S-1 filing, *supra*.

Shutterstock claimed they have no documents responsive to Request for Production No. 26, a claim they repeated in a representation they made to the Court at the conference preceding this motion. It's plainly false (like their denials of receiving the March 2020 letter). Shutterstock's website contradicts this denial, stating: "Contributors from *certain countries* have to wait 90 days before they are eligible for payment" or if "your Shutterstock contributor account has been flagged by our system as originating from a *high-fraud area*." (Webster Decl. Ex. 1 (emphases added).) A Shutterstock representative explained this "is a business decision that protects all of our rights and interests." (Webster Decl. Ex. 4, p. 8.)

Shutterstock's founder Jon Oringer, who was CEO until last year and remains Executive Chairman, stated: "Any high fraud countries will have to submit their portfolio before we accept. We won't accept any of these high fraud rate countries without prior review of their portfolio … Accounts from certain parts of the world will have to try a little harder and submit a little more proof to get an account here." (Webster Decl. Ex. 3, pp. 3–4, 5, 8; Webster Decl. Ex. 2.) "[W]e have received criticism for watching certain countries carefully … We need to be able to have some sort of document with their name on it … it keeps happening in a few countries … over and over", said this Shutterstock executive. (*Id*.)

Shutterstock had a policy to verify Contributor identity documents (Webster Decl. Ex. 16) but recently decided to not do so ("A few years ago, Shutterstock was taking, for example, IDs, because we wanted to verify that the people who are giving us content were

real people and, you know, to deter fraud and things like that. And then we realized, well, do we really need all of that data?", Webster Decl. Ex. 20, p. 5).

Shutterstock has said they sourced the Photographs in suit from Shutterstock Contributors in Russia and Bangladesh. (ECF 15, 18.) Information sought by this request is relevant to Plaintiffs showing that Shutterstock knew it could not reasonably rely on the representations of these Shutterstock Contributors, including in part because of indicia of fraud and copyright infringement both associated with those Contributors and those countries. This request is relevant to showing that Shutterstock had "red flag knowledge" under the DMCA, and further to showing willfulness of Shutterstock's infringement.

The Court should specifically find that Shutterstock's claim that they have no documents responsive to Request for Production No. 26 is plainly false and then order Shutterstock to produce responsive documents.

## CONCLUSION

As Shutterstock's executive chairman said: "We've sold more images than anybody on this planet".[35] Shutterstock is the perhaps the most sophisticated IP licensor in the world, but is downplaying their capabilities to dodge their discovery obligations and in a continuation of Shutterstock's complete disregard for the rule of law. Plaintiffs respectfully request the Court grant Plaintiffs' motion and order Shutterstock to comply with Plaintiffs' discovery requests.

---

[35] The Art & Science of Visual Search, *supra*, at 02:15.

Dated:  August 23, 2021          **TAFT STETTINIUS & HOLLISTER LLP**

By:  s/ *Scott M. Flaherty*

       Scott M. Flaherty     (#388354)
       Jordan L. Weber      (#396769)
       O. Joseph Balthazor (#399093)
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402-2157
Telephone:    (612) 977-8400
Fax:          (612) 977-8640
Emails:       sflaherty@taftlaw.com
              jweber@taftlaw.com
              obalthazor@taftlaw.com

**ATTORNEYS FOR PLAINTIFFS**
**ITASCA IMAGES, LLC**
**AND TONY WEBSTER**