**VIDEO TRANSCRIPT**

**Title:**        ShutterTalk Live: Legal Considerations for Submitting Content

**URLs:**        https://www.shutterstock.com/blog/learn-how-to-protect-your-content-in-our-shuttertalk-live-workshop
https://vimeo.com/116274603

**Speakers:**    Sejal Patel, Head of Intellectual Property Compliance, Shutterstock, Inc.
Unknown Interviewer

---

Sejal Patel (00:32):

(silence)

Sejal Patel (00:47):

Hello and welcome to today's ShutterTalk. My name is Sejal Patel and I'm the head of int - - intellectual property compliance here at Shutterstock. Today I will be going over Shutterstock's content submission policies with you with a specific focus on legal considerations for submitting content. While I hope that the information in today's ShutterTalk helps you understand Shutterstock's content policies, I do wanna emphasize that the information in this talk is not intended to be legal advice. If you require further information, we suggest that you consult your own attorney for more information.

Sejal Patel (01:25):

So, here's the roadmap of what we'll be discussing today. First, we'll start off with copyright and trademark, specifically I'll go into what can be copyrighted using reference images, content submissions with trademarks, captions and keywords for commercial content, and I'll direct you to our known restrictions list. The second topic that I'll be discussing with you today is releases, specifically property releases and model releases. The last topic that I'll be covering with you today is editorial content, specifically our general standards, credentials, and captions and keywords for editorial content. So, let's discuss copyright and trademark. The reason that I've put both of these concepts together side by side is because many of our contributors confuse the two definitions. Copyright, specifically, gives the author of a creative work the exclusive right to

**EXHIBIT 30**
**Page 1 of 23**                                          Page 1 of 23

display, reproduce, distribute and financially benefit from the work they create. A trademark is different. A trademark is a word, name, symbol or device - or a combination of these things - that is used to distinguish and identify the source of pro - - certain products or services. So, to be clear, copyright is the set of rights that an artist has to use their work exclusively. And a trademark on the other hand is a symbol, word or a combination of those things that's used to identify the source of certain products or services. So, keep this in mind as we go through this talk.

Sejal Patel (02:50):

So, what can be copyrighted? Any original work of authorship fixed in a tangible medium may be protected by copyright. So, the moment that you shoot a photo, that can be protected by copyright. When you sketch an illustration on a piece of paper, that work is immediately protected by copyright. What isn't protected by copyright? A concept, idea or method is generally not copyrightable, only the expression of those things can be copyrightable. So, let's go through a few examples. A concept or idea would not be copyrightable, but an original expression of that concept or idea would be copyrightable. An event in and of itself would not be copyrightable, but an original work such as a photograph depicting the event would be copyrightable. Lastly, a method wouldn't be copyrightable, but an original work created by using the method would be copyrightable.

Sejal Patel (03:45):

Now one of the big questions we often receive from Contributors is, "Are other contributors allowed to use and cr - - my idea and create their own image from it? And conversely, can I sort of take an, an idea from another Contributor and create my own work?" As we established, ideas and themes can't be copyrighted, only their expressions. So, let's go through some examples. On the top left we have an image, a vector image of a set of labels that have a nautical theme. Uh, there are phrases that are sort of, uh, in conjunction with this theme, land and sea, there are also icons such as sailboats, anchors, steering wheels, things of that nature, that sort of emulate this nautical theme. The image to the right of that also conveys a theme of nautical labels, however, the expressions are sufficiently different because the composition, the specific elements and the

**EXHIBIT 30**
**Page 2 of 23**

Page 2 of 23

colors are different. So, this is an instance where the ideas are the same but the expressions are sufficiently different that this would be acceptable by Shutterstock standards.

Sejal Patel (04:49):

Similarly, the images on the top right, they both have a similar theme or idea which would be a flag imprinted on a human hand. Again, the composition and the elements between the two images are sufficiently different. If you'll notice, the stars are in different locations on the hands. They're, they have a different composition and the stripes are in different locations. So, this would be a situation again where, uh, there, the ideas are the same, but the expressions are sufficiently different by our standards. And then our last example on the bottom is the same thing. Similar ideas and themes between the two images which would be a butterfly and flower sort of design, but the elements between the two images are sufficiently different even though the ideas are the same. So, by Shutterstock's standards, these would all be acceptable even though they have the same ideas.

Sejal Patel (05:40):

Now another question that we frequently get from contributors is, "Am I allowed to take the artwork of another artist and make modifications and then submit it as my own?" Uh, for the purposes of this discussion, we'll refer to that original image as the reference image. The answer to this question is that, no, you may never take another artist's artwork and make alterations and submit it as your own. There's sort of this myth out there that if you take somebody else's work and you alter it by 30% and submit it as your own you're allowed to do that. And that's simply untrue. The reason for this is because the artist of that original image or the reference image holds the right to create derivative works. And this is one of the rights you have as a copyright owner. A derivative work specifically is a variation or a transformation of the original work. So, let's go through some examples of derivative works.

Sejal Patel (06:36):

Uh, one example would be to draw a sketch of an existing painting. In this case, the sketch would be the derivative work and the existing painting would be the original reference work. Unless you own the copyright to the original reference image, which would be the existing painting, you would not be able to submit this sketch. Uh, similarly if you create a silhouette

**EXHIBIT 30**
**Page 3 of 23**

Page 3 of 23

from a photograph, the photograph in this case would be the reference image and the silhouette would be a derivative work. Unless you own the copyright to that original photograph, you may not submit the silhouette to Shutterstock.

Sejal Patel (07:14):

So, let's go through some visual examples of reference images used to create derivative works. On the top left we have a reference image featuring two owls in a bird cage. The image to the right of that is a derivative work which incorporates the elements of the two owls and some of the hard elements to create a separate derivative work. Without owning the copyright to the reference image on the left, you would not be able to submit the image on the right to Shutterstock. Uh, similarly on the bottom we have the original reference image of a ballet dancer, uh, to the left and a silhouette which is a derivative on the right. Without owning the copyright to the reference image on the left you would not be able to submit the silhouette on the right to Shutterstock.

Sejal Patel (07:58):

Now if you do wish to submit content, uh, that is based on a reference image, you would need to fill out a property release in order to submit the content. So, in order to do this, you can go to our site, uh, I'll give you a link a little bit later in the presentation. You would fill out the area under the name and description of the property, you would just fill out what the reference image is. And in the area that allows you to attach a screenshot or thumbnail of the image, you would upload a copy of the reference image. When you submit your content, you would upload the property release to the property release section and then you'd submit the content. Now, if you want to submit other works based on that original reference image you could just use the same release going forward.

Sejal Patel (08:42):

Now let's move on to trademarks. As I discussed earlier, a trademark is a word, name, symbol or device or a combination of these things that is used to distinguish and identify the source of certain products or services. In order to prevent misuse of a trademark or a logo by a customer, we do not accept content containing isolated or highly visible trademarks or logos for a commercial use. The exception is with footage clips, uh, given the different nature of footage

**EXHIBIT 30**
**Page 4 of 23**                                                        Page 4 of 23

media, we will allow commercial content that has trademarks in it as long as the trademarks are fleeting or not static, or otherwise not in enough focus to cause an issue for the customer. In general, we suggest that you edit the trademarks out of content if you wish to submit it for commercial use. It allows for content to be used for a wider variety of purposes since the uses are much broader and potentially make more on those images.

Sejal Patel (09:40):

So, let's go over some examples of when trademarks are or are not okay in images. Um, on the top left is an example of an iPh - - uh, what looks to be an iPhone, but clearly the trademarked elements have been edited out. The buttons and the positioning of the camera and the light have been edited out. So, this would be acceptable for commercial use because none of the things that make the phone trademarked are visible. On the bottom left, similarly, all of the trademarks have been scrubbed from the image of Times Square. In fact, this contributor, uh, not only scrubbed out the trademarks, um, they replaced all of the artwork on the billboard and wherever the trademarks existed with their own work, um, and edited it onto the image and this image actually does quite well. So, sometimes it's worth it to put the work into taking out trademarks. Um, on the top right we have an image that we would not consider acceptable for commercial use. It very clearly features an Apple product and you can see the Apple logo. Now the reason we wouldn't take an image like this for commercial use is because we wouldn't want a customer to take this image and put it on their own product packaging and then have an issue down the line with Apple because there's an Apple logo and a consumer is confused that the customer's product is an Apple product. Um, so, that image would not be acceptable. On the bottom right we have, um, an image that we would consider to be acceptable, uh, not only because there are not any visible logos but also because the vehicle is not, uh, in full view. As many of you know, we have a very strict restriction on isolated vehicles, the shape of vehicles and certain parts of the vehicle may be subject to trademark protection which is why we don't take images of isolated vehicles for commercial use. In this case, the image is close-up enough of the car and there are no trademarks that we would accept this for commercial use.

Sejal Patel (11:39):

Now let's talk about captions and keywords for commercial content. Uh, specifically this relates to trademarks. Trademarks should not be used as keywords for or in the title of commercial

**EXHIBIT 30**
**Page 5 of 23**

Page 5 of 23

content. And the reason for this is we don't want to mislead customers into thinking that an image is associated with a certain trademark when in fact it isn't, because it makes the customer potentially likely to use the content in a way that it shouldn't be, uh, so please stick to descriptive words about the content instead to help customers locate your content and use it correctly. So, we've discussed copyright and trademark concerns. We actually have a list. It's our known restrictions list, and you can find it at the URL that is on the screen right now. Um, it's a list of subjects that we know have submission restrictions. Uh, please note that the list is not all inclusive. Ultimately, under our terms, it's up to you to de - - submit content to Shutterstock that doesn't pose any legal issues, but it is a really good guideline for what we absolutely will and will not take.

Sejal Patel (12:43):

Um, subjects to look out for just when you're shooting content or submitting it to Shutterstock. Um, look out for modern architecture in iconic buildings. Uh, the modern architecture tends to have copyright protection. Iconic buildings tend to have other protections because the buildings themselves wants to be able to license the image of the building. Um, and also look out for isolated subjects, such as electronics in art. Uh, since those images are, uh, since those images focus on those subjects, they tend to have a higher likelihood of copyright and trademark concerns.

Sejal Patel (13:18):

So, let's move on to our second topic, releases. A release is a legal document that releases the shooter and/or users of their content from certain legal issues. Uh, first, we'll discuss model releases and, very generally, if content depicts an identifiable person, you should obtain a valid model release to use the content commercially, and I'll explain why in a few minutes. Um, and second, I'll discuss property releases. Uh, if you're shooting on private property or you're shooting private property which is distinctive, even if you're in a public place, uh, you need to obtain a property release to use that content commercially.

Sejal Patel (13:54):

So, first, let's talk about model releases. What makes an individual in content recognizable? This question is a little bit tricky because it ultimately depends on the specific image and also the

**EXHIBIT 30**
**Page 6 of 23**

Page 6 of 23

technical enhancements that might be able to be made to the image that would ultimately reveal the face of the subject, but the general rule of thumb is that, if the individual could recognize themselves, then a release is needed. Um, this doesn't just mean that if they can see their face that the content would need a release. Um, this also includes unique hairstyles, tattoos, clothing, accessories, and other things that would make a person recognizable.

Sejal Patel (14:33):

So, the reason that a model release is necessary to begin with is that it helps protect both the photographer and customer from any claims that might be brought by the model. Uh, specifically, models and individuals have publicity rights, and this is a right to commercialize the use of your likeness so, by having the model fill out a prop - - uh, a model release, uh, they're agreeing that you are able to use their likeness and to commercialize their likeness.

Sejal Patel (14:59):

Does it matter what kind of model release you use? Well, it really depends on what you want to do with the content. If you want to license it through Shutterstock, then it does matter because there's only certain releases that we'll accept that conform with our standards. Um, I've provided you with a link there that lists all of our acceptable releases. We do take the releases of most other photography agencies, as well as Easy Release, and we have translated our own releases into 14 languages, so check that out for a list of what we will take.

Sejal Patel (15:33):

So, let's go through some examples of what types of images would or would not require a model release. So, the images on the left wouldn't require a model release because the model is not recognizable in them. On the top left, if you lighten the picture, uh, you still aren't able to see the person's face because they're facing towards the sunset, and there's nothing else on them that would make them recognizable, so that would be fine without a model release.

Sejal Patel (15:58):

Similarly, the image on the bottom, it cuts off half of the model's face. Uh, they would probably not be able to recognize themselves, and so that would not require a model release. However, I do want to point out that it always makes sense to try and get a model release, especially if it's

**EXHIBIT 30**
**Page 7 of 23**                                                      Page 7 of 23

going to be a photo shoot anyways, um, because you never know what we can and cannot take, so we always encourage you to get a release, even if the image may not require it.

Sejal Patel (16:27):

On the right side, we have examples of images that do require a model release. The example on the top right is pretty evident. You can see the model's face in its entirety, so this would clearly need a release. The image to the left of that is almost a silhouette, but not quite. You can see distinguishing features on the person's face and, when this image is lightened, you can actually see other elements on like earrings and things like that on the face, so that would require a release.

Sejal Patel (16:56):

On the bottom, we sort of have a similar image to the one on the left in the sense that you can only see half of the model's face. However, they have recognizable or unique jewelry and makeup to make them recognizable enough that this image would need a model release.

Sejal Patel (17:13):

Now, what information do we require on our model releases? Uh, no matter whether the release comes from Shutterstock or is the release of another agency or your own, we require the name, contact information, and signature of the photographer, model, and the witness, as well as the date of the shoot.

Sejal Patel (17:33):

The most important thing to understand is that all signatures have to be affixed or signed on the same date, so the purpose of the witness signature, especially, is to show that they've witnessed the model signing the release. So, you can't pre-fill everything out and then have a witness sign it another day because that simply undermines the entire reason for having a witness signature. So, make sure when you get those signatures, they're all done at the same time.

Sejal Patel (18:03):

For releases applying to minors, and we do have a separate minor model release that isn't shown on the screen, um, but in that release, the parent or guardian must include their name and

**EXHIBIT 30**
**Page 8 of 23**

Page 8 of 23

signature and then fill out the information of the model. Please note that the parent or guardian may not also be the witness. It would have to be somebody who is separate from that person as they are signing for the model.

Sejal Patel (18:27):

Now, let's move on to property releases. When do you need a property release? If you're shooting on private property or shooting private property which is distinctive from a public place, you need to obtain a property release, and it's necessarily for a vi - - for a variety of legal considerations. Um, the confusion seems to always be, "Well, if I'm in a public place, why do I need a property release for, you know, an image I've taken from the outside of the property?" Well, you only really need to do that if the property is highly identifiable or unique, and we'll go into some examples in a minute.

Sejal Patel (19:01):

Does it matter what kind of property release you use? Uh, again, same answer as I gave with the model releases. There are certain limited releases that Shutterstock will take. They do include the releases of all of the major agencies, including Easy Release, and we do have our own releases in 14 different languages.

Sejal Patel (19:20):

So, let's go through some examples of when a property release would or would not be required. Um, on the left, we have images that are taken from a public place showing properties that we don't think are highly identifiable or unique, so these would not require a property release. On the right side, we have images that would require a property release.

Sejal Patel (19:40):

Uh, on the top right, we have the famous Temple Bar in Dublin. It is a very well known bar and, for this reason, it would require a property release because, perhaps, Temple Bar, being so famous, might have other rights, such as trademark rights, to the use of its name and so, for this reason, we would want a release to make sure that we can actually license that image. On the bottom right, we have an image that was taken in the interior of a private property, so this would also require a property release. Um, it doesn't matter if the interior that you're taking the image in

**EXHIBIT 30**
**Page 9 of 23**

Page 9 of 23

is super generic, and maybe somebody wouldn't be able to recognize it as their own. As long as it's taken on the private property, you should be submitting a property release with it.

Sejal Patel (20:26):

So, what information is required on the property release? Um, again, you need a name, contact information, and signature of three different people, and that would be the photographer, the property owner or an authorized representative of the property, and a witness. Um, in addition, you also need a description of the property.

Sejal Patel (20:44):

All signatures should be affixed on the same date, and that means all signatures should be put on, or signed onto the release at the same exact time. As I mentioned previously, the purpose of this is to ensure that the property owner did, in fact, sign the release and, if the witness signature is on a different date, then that totally undermines, um, them being the ones to witness that signature being attached on that date, so don't forget to do that.

Sejal Patel (21:13):

Now, let's move into our last topic, which is editorial content. Editorial content labeled Editorial Use Only on Shutterstock is limited to non-commercial uses, and they can't be used to advertise or promote a product or service. Editorial content can be used to illustrate newsworthy and current events and subjects of human interest, including the arts, business, culture, health, lifestyle, social events, technology, and travel.

Sejal Patel (21:38):

So, let's go through some examples of how customers can use editorial content. Uh, one example would be the use of an image to illustrate news in a newspaper, magazine, blog, or website article. These uses are generally not considered commercial, and they're not advertising or promoting a product or service, rather they're providing commentary or opinion. So, this would be an acceptable editorial use.

Sejal Patel (22:02):

**EXHIBIT 30**
**Page 10 of 23**

Page 10 of 23

Another example of an editorial use is use of a footage clip to comment on an event in a non-commercial presentation, such as a documentary film. Again, a documentary usually illustrates or comments on some topic and does not advertise or promote a product or service, so this would be an acceptable editorial use.

Sejal Patel (22:25):

So, what are Shutterstock's general standards for editorial content? Well, generally, editorial content isn't released. So, this means that the content can contain trademarks, copyrighted elements, recognizable individuals, and properties without releases. However, just because editorial content can contain non-released elements doesn't mean that we will take content that would not be suitable for commercial content for editorial use.

Sejal Patel (22:54):

So, to give you an example, if you have an image that you want to submit and it features a recognizable individual or property and you don't have a release for either, you shouldn't be submitting it for editorial use without that image having some sort of newsworthy value or an ability to convey something of human interest.

Sejal Patel (23:14):

Um, eh, I realize that that sounds a little bit vague but, basically, the rule of thumb here is, just because it isn't unreleased doesn't make it, doesn't mean that it's necessarily suitable for editorial use. Um, rather, the content should depict a specific subject that could be the topic of a news story or a piece of commentary. So, keep that in mind when you're submitting editorial content.

Sejal Patel (23:40):

So, let's go through our general standards for editorial photographs. We generally accept one of two types of editorial photographs. Uh, the first is documentary images and, as the name would suggest, uh, documentary images, document an event or subject of human interest. The second type of editorial photograph that we'll take, and we just recently opened this up in the last year, is illustrative images. These images illustrate an event or subject of human interest through staging. Uh, for more specific guidelines, uh, for editorial content, please see the link that I have there.

**EXHIBIT 30**
**Page 11 of 23**

Page 11 of 23

Uh, it goes more in depth about the quality standards that we have for each respective type of editorial photograph.

Sejal Patel (24:22):

So some examples of these two types of editorial photographs that we'll take are on the screen. On the left side, we have examples of documentary images. Um, on the top-left, we have an image that documents, uh, Prince Will and Kate after their marriage, uh, following their ceremony. And then on the bottom-left, we have a famous surfer, uh, and he - - his performance in a competition is being documented there. So documentary images document the event.

Sejal Patel (24:51):

On the other hand, we have illustrative images which are on the right side. And these are doc - - these are staged editorial images. So on the top-right, we have a staging of an iPad with Steve Jobs on it. And this type of image would be used or could be used in an article or commentary about either Steve Jobs, or Apple, or iPads. On the bottom-right, similarly, we have another staged image, and it features, predominantly, a Starbucks coffee cup. And this could be used in an editorial context to describe or comment on Starbucks or the coffee industry, um, and things of that nature. So, some editorial content requires credentials. Credentials are proof that you're authorized to shoot certain private ticketed events. And they're required because they address contractual concerns. Often when you go into a ticketed event, when you buy your ticket, there's fine print on the back. And it's actually a contract. Often there will be language that restricts the ability for you to shoot content and to use it commercially or to license it.

Sejal Patel (26:02):

And that's why we require credentials for these images because, or footage, because we want to make sure that if you've shot something there and you're licensing it through Shutterstock, you actually have the right to do so, and you're not breaching a contract that you have, you, that you have with the event.

Sejal Patel (26:21):

So let's go through some types of events that require credentials. The rule of thumb is that if the events took place in private venues and/or required ticketed entry, they require credentials. Some

**EXHIBIT 30**
**Page 12 of 23**

Page 12 of 23

examples are sporting events, concerts, festivals, trade shows, theatrical performances, conventions, openings, and just ticketed events in general. Um, be on the lookout for sporting events and concerts and concert festivals. Those usually have very strict, uh, restrictions on what you can do with content you've shot there because they usually want to be able to license the content for themselves.

Sejal Patel (26:59):

So if you're going to submit content, especially falling under those three categories, make sure that you have credentials to license that content. Please note that images or footage taken out free events in public places, or at events that don't require for your ticket do not require credentials. So not every type of event is going to require credentials.

Sejal Patel (27:19):

And I'll give you some examples. If you are shooting footage of a fair taking place in New York City, it's out in the open, that would not require credentials. It's not a private ticketed event. And so you could just submit that as regular editorial content. If there's a festival, or parade, or something like that going on, and it's just out in the public, out in the streets, again, if you don't require a ticket and you don't have to pay for entry, that wouldn't require credentials.

Sejal Patel (27:50):

If you do want to submit content that requires credentials, please email credentials@shutterstock.com with proof of your credentials prior to submitting the content. And the reason for this is it, it requires review of the credentials before we can take the content. So it'll be much faster if you send in the credentials to us first. We'll accept one of two things, either an event badge that indicates that you were authorized to shoot the event or a correspondence with an authorized representative of the event. Uh, we do recognize that credentials vary by event, so when you write in we've, we do evaluate these on a case-by-case basis. So let's talk about captions and keywords for editorial content. Since the purpose of editorial content is for use in news, opinion, or commentary, it's really important to be accurate. Since customers are looking for the content, um, in order to potentially put it in the news, you don't want to supply them with misinformation. So please don't put irrelevant words in the title or keywords, um, because we don't want the content to inadvertently be used in a way that's incorrect. Trademarks

**EXHIBIT 30**
**Page 13 of 23**

Page 13 of 23

can be used in the captions of editorial content but only where the subject of the content actually relates to the trademark. So earlier, I'd shown you a photo of a Starbucks cup for, as a example of a documentary illustrative - - Uh, sorry. An illustrative editorial image. If you were to submit that image to Shutterstock, having the keyword Shutter - - having the keyword Starbucks would be perfectly acceptable. And it would also be acceptable in the caption. However, if you were to include Folgers or Diedrichs or related but not really accurate keywords, that would not be acceptable. We don't want to confuse our customers with the keywords in the captions. So please stick to what is accurate.

Sejal Patel (29:50):

So the last topic for this discussion is captions for editorial content. Here's how a caption should generally be structured. It should be the location of where either the event took place, or, um, in the case of illustrative editorial content, where it was created, followed by the date, and then ending with a factual description of the content. If you don't know the exact date of when something was created or when an event took place, you can use circa as a way to approximate when the content was, uh, taken.

Sejal Patel (30:25):

In the description, please do not add opinions to, to the description and limit the description to facts. So an example is we have the caption up above singer 'Deborah Harry performs on stage at Six Flags Great Adventure.' Don't add something at the end of that like, "Deborah Harry is the best singer of all time." This is a bit misleading and we don't want our customers to inadvertently use that information for their editorial use in an incorrect manner. So stick to facts.

Interviewer (30:59):

[inaudible 00:30:59].

Sejal Patel (31:00):

Okay.

Interviewer (31:01):

And earlier one, uh, that you have addressed but might be worth reiterating.

**EXHIBIT 30**
**Page 14 of 23**

Page 14 of 23

Sejal Patel (31:06):

Mm-hmm (affirmative).

Interviewer (31:06):

Okay so the question is, when you take street photos of [inaudible] are model releases needed?

Sejal Patel (31:12):

Okay. So the question is when you take street photos of individuals are model releases needed. Now, for editorial uses, as long as that image or that footage clip has some editorial value and we've consider street scenes to have editorial value, a model release would not be required. However, some countries are a little bit more protective about that. Um, it's up to you wherever you're shooting the content to make sure that it doesn't infringe on some other rights.

Sejal Patel (31:39):

Um, you might be surprised if during the review process you submit that image and all of a sudden we're asking for a model release. It might be because that jurisdiction has stricter rules. In general, though, those images and those finished clips are acceptable for editorial use, uh, and do not require a model release.

Interviewer (31:57):

There's a recent court case of a model suing a photographer because of images [inaudible 00:32:01] on photographic of websites and print. Can you go into more depth to the sensitive usage of some of the images?

Sejal Patel (32:07):

Sure. So, as you know, unless you've opted in, you can't, your content won't be licensed for sensitive uses. Uh, in general, with all of our license, we do not allow the use of content in pornographic, defamatory, or otherwise illegal uses. Um, if we do discover such usage, or if you discover that your content is being used in such a way, please contact us so that we can look into it and rectify this issue - - situation where possible.

Interviewer (32:33):

**EXHIBIT 30**
**Page 15 of 23**

Page 15 of 23

How often are the reviewers [inaudible] have had to [inaudible] the changes?

Sejal Patel (32:39):

So changes occur almost every day. We do have, uh, almost 200 reviewers. They are kept up to date, but as you can imagine, there are a lot of restrictions. Uh, but we do update our restrictions list every single day. And internally, we do send out communications. Um, so - -

Interviewer (32:56):

Um, can you, can you inform us of when the new forms may come online.

Sejal Patel (33:06):

Somebody asked when the new forms would come online and I don't have that information.

Interviewer (33:25):

Are quotes copyrighted even if you don't know who said it?

Sejal Patel (33:29):

So the question is, are quotes copyrighted even though you don't know who said it? Um, we do have a restriction on quotes where we can't - - Well, this is tricky. Um, I'm going to have to do a little bit more research into this because it does depend on the situation. And hopefully we'll be able to send you a follow up about that.

Interviewer (33:47):

A scene with multiple logos that are not the main focus, is that okay for a commercial?

Sejal Patel (33:54):

So the question is a scene with multiple logos where the logos are not the focus, is that okay for a commercial? Um, this is highly dependent on the content that's submitted. Uh, if the trademarks are obscured enough or not visible enough, we might take it. Otherwise, if they're viewable at a hundred percent, our reviewers will reject those images.

Interviewer (34:17):

**EXHIBIT 30**
**Page 16 of 23**

Page 16 of 23

And what can you reply, what can you reply as to why [inaudible 00:34:18] information about the violation of human to take all [inaudible 00:34:30]?

Sejal Patel (34:31):

Okay. So the question is when the Compliance Team is alerted of a, an infringement, uh, what is it that Compliance does? Now, this comes up in a variety of situations. Um, I'm assuming that the person who's asking is asking about Contributor-to-Contributor violations. What we do is we send an inquiry out to the Contributor who's, um, allegedly or infringed the original image. And we also check the files and the upload dates to see, um, potentially which image came first. And then we also evaluate how similar the images are. And then we make a decision from there as to what we should do with the content and as to the Contributor's account.

Interviewer (35:11):

Can I get an all-time model release um, family members such as my grandfather and not related to the specific day of shoot?

Sejal Patel (35:18):

So this is a really good question. Can you get a model release that basically, um, is an all-time release and doesn't have to relate to the specific shoot. If there's somebody that you work with frequently, what I would suggest is putting in a year range, or at least indicating this is good for 10 years, 20 years, forever, um, and indicating what your relationship is to that model.

Sejal Patel (35:42):

If we know that it's a family member, we can be a little bit more lenient because we know that it is somebody who you have a relationship with. Um, but these types of, uh, things will have to be reviewed on a case-by-case basis.

Interviewer (35:56):

If I'm photographing a minor and the mother signed the min - - minor's model release, can the toddler witness the release?

Sejal Patel (36:03):

**EXHIBIT 30**
**Page 17 of 23**

Page 17 of 23

So the question is that if you're shooting a minor, uh, can the mother sign as the guardian or parent on the release and can the father sign as the witness? And that's acceptable.

Interviewer (36:16):

How old should a building be to be sure we don't fall on copyright issues with the building?

Sejal Patel (36:22):

So, the question is, how old should a building be to make sure that there are no copyright issues with the building. So, this generally varies, but what, the rule of the thumb that I'd like to give you is, any building that's been built before, fully built, fully constructed before 1900, uh, we'll take that without a release.

Interviewer (36:42):

This falls on something you were touching on, but, um, um, we have a lot of signed Dutch model releases, can we use them to Shutterstock?

Sejal Patel (36:54):

Someone asked, um, whether they can submit signed Dutch model releases to Shutterstock? So, previously, I'd given you a link of the acceptable releases that we will take. Um, if the release is one of those releases, we'll take it, even if it's in Dutch. If, uh, it doesn't fall under one of those acceptable releases, what we request that you do is get the releases translated, just a represe - - representative sample of the actual language, and then write into us at 'submit' so we can evaluate it, and then put a note in your account to, if we are able to take those images.

Interviewer (37:27):

And for a scene or a city scape containing people that are not the main focus, can you use that for a commercial?

Sejal Patel (37:35):

So, someone asked for scenes or cityscapes where people are not the focus, can we take that for a commercial? Uh, this is highly dependent on what the image actually shows. Um, we do get a lot of city scenes where the people are depicted in a way that shows fast motion and you can't see

**EXHIBIT 30**
**Page 18 of 23**

Page 18 of 23

them at all, that would be perfectly fine. In a situation where there's maybe only the silhouettes of people or they're blurred out sufficiently, that would be fine. Otherwise, if you can recognize any faces, uh, that would require a property release for a commercial use.

Interviewer (38:07):

If a customer buys an image using the standard license, but uses it with the extended - - license, what can compliance do?

Sejal Patel (38:08):

Sure. The question is, if a customer buys an image of yours under the standard license, and then you find out that they're using it under the enhanced license, what can Compliance do? If this happens, or you suspect that this is happening, write into us. We investigate every one of these claims we receive. Um, really, the difficult in these types of claims is making sure that the image was actually licensed from Shutterstock. So, if the image wasn't actually imaged from Shutterstock, we might, we may be limited in what we can do in terms of enforcing your rights. Um, but do write in, we will investigate it. In situations where we believe customers are misusing the content, we do reach out to the customer where appropriate and try to rectify the situation and get the correct license.

Interviewer (39:04):

If I shoot myself or a property, do I have to sign the model release form? Or, myself or, um, as, and as a photographer and model at the same time?

Sejal Patel (39:16):

The question is, if you're shooting an image of yourself, do you have to fill out a model release for both yourself, um, for yourself as a photographer and as the model? What you can do is submit a model release and just state on it that this is myself. And the reason I say thi - - uh, the reason we need that release to begin with is so that when the image goes live on the site, the customer can see that the image is actually released. That's why we need the release. It's not a matter of, uh, you know, making sure that you're the person, um, who's absolutely in the image. We'll trust you, but you just, we need to have that piece of paper so that we can put it on to the site.

**EXHIBIT 30**
**Page 19 of 23**

Page 19 of 23

Interviewer (39:53):

And then, back to the infraction issue, um, does Shutterstock sue the violator? And if so, does the author get some of the money they get?

Sejal Patel (40:04):

So, someone asked, um, if there's an infraction, does Shutterstock sue the customer and does the Contributor get some portion of, uh, the money that was made? Um, I can't really go into details about that, but I will say that we do take action where necessary. And if we're able to do something for the Contributor, we will, but it's often mo - way more complicated than that.

Interviewer (40:28):

What about model releases of my own children? Um [inaudible 00:40:34] do you need model releases for your own children?

Sejal Patel (40:37):

Yes, you do nee - - the question was, do you need model releases for your own children? And yes, you would need a model release for your children. And, uh, you could sign as both the parent, or you could sign as the photographer, but you should probably get the other guardian or parent. If there is some family circumstance that you can't do that, then write in to us and we'll help you through it.

Interviewer (40:58):

Can a company or two individuals, together, both copyright a photo and [inaudible 00:41:03] submit it to Shutterstock?

Sejal Patel (41:04):

So, the question is, can two people hold a copyright to the content that they submit to Shutterstock? So, there's two parts of this question. Uh, one is, can copyright be jointly owned? And the answer to that is yes. Two people, if they've created a work together, they can own the copyright to that image. The second part of that is, can you submit that content to Shutterstock? Uh, when you hold a Shutterstock account, under our terms, you agree that you own and control the copyright to that content. So, you need to figure out whether you own those rights before

**EXHIBIT 30**
**Page 20 of 23**                                                                 Page 20 of 23

submitting that content and whether it causes any conflict with the other copyright owner. In general, if we notice this is happening, we're going to want some documentation that the other person consents to you submitting that content to Shutterstock.

Interviewer (41:53):

If I erase some copyrighted building and replaced it with a similar building with similar features, can I edit to [inaudible 00:42:00]?

Sejal Patel (42:01):

So, someone asked if they have an image of a building, correct me if I'm wrong, and they've edited it so that it's a different building, but it has similar features, can they submit it? Now, this sort of goes back to our reference image policy. Um, it's the same concept. If there's something you're taking that's copyrighted and you're altering it and submitting it as your own, um, you shouldn't be doing that. Now, if you wanna totally alter it, I mean, it, it depends on the degree, you might be able to. But if it's close enough to the original building, you shouldn't be submitting that.

Interviewer (42:35):

Do I need a property release for a museum shooting?

Sejal Patel (42:42):

Do you need a property release for a museum shooting, is the question. If you want to submit that image for a commercial use, then you need a property release. Otherwise, you can submit it, uh, for editorial use only, assuming it meets our editorial standards and is submitted with the proper caption and keywords.

Interviewer (42:55):

Do you have any plans to have exclusive [inaudible 00:43:00]? Can you talk about plans, you already did a little bit, but you can talk about plans, landmarks, buildings, statues, artwork, um, what is allowed and what's not?

Sejal Patel (43:15):

**EXHIBIT 30**
**Page 21 of 23**

Page 21 of 23

Someone asked, can I go more into famous buildings, statues, artwork, and what is allowed and what isn't? Um, as I mentioned previously, the known restrictions list gives a, you a list of things that we will and will not accept under those, uh, categories. In general, artwork, you shouldn't be submitting artwork that doesn't belong to you. We already discussed this with the reference image policy. And, uh, we won't take public domain artwork, so you can't just scan in a Van Gogh or some other public domain art and submit that as your own. In terms of buildings, I think I already mentioned, uh, watch out for mar - - modern architecture because that tends to be cop - - uh, protected by copyright.

Sejal Patel (43:56):

Uh, but when it comes to older buildings, such as those before the 1900's, we're a little bit more lenient with those and those can be accepted for a commercial use.

Interviewer (44:04):

Uh, if I'm not sure whether footage should be marked as editorial, will a footage reviewer mark is as editorial for you or will they reject it?

Sejal Patel (44:15):

Okay, if you aren't sure whether footage should be marked as editorial, will a footage reviewer be marking it is as editorial for you or will they reject it? This largely depends on the size of the badge and how much content you're submitting with that badge. So if you're, you know, if there's a few clips and questions then they might just reject it. If there's a larger amount of clips that this might cover, we would have a member of our Contributor Success team reach out to you and explain to you, um, you know, how to add in the editorial captions and things like that. So we don't try - - we aim to not immediately reject your images. We try to converse with you a little bit before doing that.

Interviewer (44:56):

If you submit a clip for editorial use and then later you get a release for it, why can't you attach your release after the fact? [inaudible]

Sejal Patel (45:20):

**EXHIBIT 30**
**Page 22 of 23**

Page 22 of 23

Okay so the question is if you submit a clip for editorial use and then later you get a release for it, why can't you attach a release after the fact? And unfortunately, the reason for this is technically we're unable to attach you release to the back end. If you - - if this issue affects a large number of your clips though, please write into us and we'll see if we can figure out a solution for you.

Interviewer (45:42):

Do you need a property release from the tattoo artist?

Sejal Patel (45:47):

So someone asked a question about tattoos. Do you need a property release from the tattoo artist? And the answer to this is yes. Uh, the reason is that tattoos are frequently covered by copyright and sometimes are even a trademark so, yes. Tattoos require a property release.

Interviewer (46:18):

[inaudible]

Sejal Patel (46:23):

Okay I think that's all for questions. Thanks for listening to this ShutterTalk. If you have any compliance related questions, please always feel free to write into us at compliance@shutterstock.com.

**EXHIBIT 30**
**Page 23 of 23**

Page 23 of 23